**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SONTOS MAUDILIA DIAZ-REYNOSO,
AKA Sontos Maurilla Diaz-
Reynoso,

*Petitioner*,

v.

WILLIAM P. BARR, Attorney
General,

*Respondent.*

No. 18-72833

Agency No.
A205-256-857

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted March 24, 2020[*]
San Francisco, California

Filed August 7, 2020

Before: Ronald M. Gould, Morgan Christen,
and Daniel A. Bress, Circuit Judges.

Opinion by Judge Christen;
Partial Concurrence and Partial Dissent by Judge Bress

---

[*] The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY[**]

### Immigration

Granting Sontos Diaz-Reynoso's petition for review of the Board of Immigration Appeals' decision affirming the denial of her application for withholding of removal and protection under the Convention Against Torture, and remanding, the panel held that the Board misapplied *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018), as well as Board and circuit precedent, in concluding that Diaz-Reynoso's proposed social group comprised of "indigenous women in Guatemala who are unable to leave their relationship" was not cognizable, and that she failed to establish that the government of Guatemala would acquiesce in any possible torture.

The panel rejected Diaz-Reynoso's contention that *Matter of A-B-* was arbitrary and capricious and therefore not entitled to *Chevron* deference. The panel concluded that, despite the general and descriptive observations set forth in the opinion, *Matter of A-B-* did not announce a new categorical exception to withholding of removal for victims of domestic violence or other private criminal activity, but rather it reaffirmed the Board's existing framework for analyzing the cognizability of particular social groups, requiring that such determinations be individualized and conducted on a case-by-case basis.

The panel observed that the Board rejected Diaz-Reynoso's proposed social group, with almost no analysis,

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

because it "suffered from the same circularity problem articulated by the Attorney General in *Matter of A-B-*." The panel explained that in doing so, the Board appeared to misapprehend the scope of *Matter of A-B-* as forbidding any mention of feared harm within the delineation of a proposed social group. The panel concluded that this was error, explaining that *Matter of A-B-* did not announce a new rule concerning circularity, but instead merely reiterated the well-established principle that a particular social group must exist independently of the harm asserted. The panel recognized that a proposed social group may be deemed impermissibly circular if, after conducting the proper case-by-case analysis, the Board determines that the group is defined *exclusively* by the fact that its members have been subjected to harm. The panel explained, however, that a proposed social group is not impermissibly circular merely because the proposed group mentions harm.

The panel concluded that the Board also erred in assuming that domestic violence was the only reason Diaz-Reynoso was unable to leave her relationship, and in failing to conduct the rigorous case-by-case analysis required by *Matter of A-B-*. The panel therefore remanded Diaz-Reynoso's withholding of removal claim for the Board to undertake the required analysis applying the correct framework.

Because the Board failed to discuss evidence that Diaz-Reynoso reported her husband's abuse to authority figures in her village community, and the government conceded remand was warranted, the panel also remanded Diaz-Reynoso's CAT claim for further consideration.

Concurring in the judgment in part and dissenting in part, Judge Bress agreed with remand of the CAT claim in light of the government's concession, but disagreed with the majority's conclusion that the Board misread *Matter of A-B-* in rejecting Diaz-Reynoso's proposed social group. In Judge Bress's view, *Matter of A-B-* held that a proposed group that incorporates harm within its definition is not a group that exists independently of the harm asserted in an application for asylum or statutory withholding of removal. Judge Bress wrote that substantial evidence supported the Board's assessment that Diaz-Reynoso's social group was defined exclusively by the harm suffered, and that the Board correctly applied *Matter of A-B-*, and the circularity rule, in rejecting Diaz-Reynoso's proposed social group.

## COUNSEL

Gary A. Watt, Stephen Tollafield, and Tiffany J. Gates, Supervising Counsel; Shandyn H. Pierce and Hilda Kajbaf, Certified Law Students; Hastings Appellate Project, San Francisco, California; for Petitioner.

Joseph H. Hunt, Assistant Attorney General; John S. Hogan and Linda S. Wernery, Assistant Directors; Susan Bennett Green, Senior Litigation Counsel; Ashley Martin, Trial Attorney; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Blaine Bookey, Karen Musalo, Neela Chakravartula, and Anne Peterson, Center for Gender & Refugee Studies, U.S. Hastings College of Law, San Francisco, California, for Amicus Curiae Center for Gender & Refugee Studies.

Richard W. Mark, Amer S. Ahmed, Grace E. Hart, and Cassarah M. Chu, Gibson Dunn & Crutcher LLP, New York New York, for Amici Curiae Thirty-Nine Former Immigration Judges and Members of the Board of Immigration Appeals.

Sabrineh Ardalan, Nancy Kelly, John Willshire Carrera, Deborah Anker, and Zachary A. Albun, Attorneys; Rosa Baum, Caya Simonsen, and Ana Sewell, Supervised Law Students; Harvard Immigration and Refugee Clinical Program, Cambridge, Massachusetts; for Amicus Curiae Harvard Immigration and Refugee Clinical Program.

Ana C. Reyes and Alexander J. Kasner, Williams & Connolly LLP, Washington, D.C.; Alice Farmer, United Nations High Commissioner for Refugees, Washington, D.C.; for Amicus Curiae United Nations High Commissioner for Refugees.

**OPINION**

CHRISTEN, Circuit Judge:

Sontos Maudilia Diaz-Reynoso, a native and citizen of Guatemala, petitions for review of the Board of Immigration Appeals' (BIA) order dismissing her appeal of an Immigration Judge's (IJ) order denying her application for withholding of removal and relief under the Convention Against Torture (CAT). Diaz-Reynoso seeks withholding of removal based on her fear that she would be persecuted in Guatemala on account of her membership in the particular social group of "indigenous women in Guatemala who are unable to leave their relationship." Diaz-Reynoso argues she is entitled to relief under CAT because, if returned to Guatemala, the Guatemalan government would acquiesce in torture she would suffer at the hands of her husband.

On her withholding claim, the BIA concluded that Diaz-Reynoso's proposed particular social group was not cognizable, relying on the Attorney General's decision in *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018). With respect to Diaz-Reynoso's CAT claim, the BIA concluded that Diaz-Reynoso failed to establish that the government of Guatemala would acquiesce in any torture she might suffer. Because the BIA's decision on both bases for relief departs from its own precedent and is contrary to this court's case law, we grant the petition for review and remand for further proceedings.

**I**

Diaz-Reynoso was born in 1989 in the small, rural town of Yamoj, in the Guatemalan highlands. She is a member of

the indigenous group known as Mam. In 2008, Diaz-Reynoso moved in with a man named Arnoldo Vasquez-Juarez, who is also Mam. Although they did not legally marry, Diaz-Reynoso and Vasquez-Juarez had a common-law marriage and Diaz-Reynoso refers to Vasquez-Juarez as her husband.

Vasquez-Juarez subjected Diaz-Reynoso to physical and sexual abuse. Among other things, he forced Diaz-Reynoso to work in the coffee fields without pay, and to have sex with him. When Diaz-Reynoso did not comply with his demands, Vasquez-Juarez attacked her, hitting her on her head and all over her body, sometimes with a belt. Diaz-Reynoso testified that she was attacked weekly, and that the resulting bruises sometimes lasted for eight to ten days.

In 2012, after four years of living with Vasquez-Juarez, Diaz-Reynoso fled and entered the United States without documentation. She was apprehended, and after roughly a month in detention, returned to Guatemala. Diaz-Reynoso moved back in with her family in Yamoj.

As soon as Diaz-Reynoso returned, Vasquez-Juarez came to find her. Vasquez-Juarez told Diaz-Reynoso that if she did not return to live with him, he would kill her, kill her daughter,[1] or harm her mother. Diaz-Reynoso returned to live with Vasquez-Juarez for about a year. The abuse got worse during that time. Diaz-Reynoso then escaped and went to live with a friend in another town for roughly a year. She was in hiding during this period and did not leave her friend's house. After that, Diaz-Reynoso returned to her family home

---

[1] Diaz-Reynoso had a daughter with a previous partner named Angel Tomas Vasquez. Although Vasquez also subjected Diaz-Reynoso to physical and sexual abuse, she has not heard from him since she left him.

in the hope that Vasquez-Juarez had forgotten about her, but Vasquez-Juarez found Diaz-Reynoso and ordered her to come back with him. At the urging of her mother, Diaz-Reynoso again fled to the United States.

Diaz-Reynoso was apprehended near Topawa, Arizona on October 29, 2014, and her prior removal order was reinstated pursuant to 8 U.S.C. § 1231(a)(5). She pled guilty to illegal entry in violation of 8 U.S.C. § 1325(a)(1), and was sentenced to thirty days imprisonment.

While Diaz-Reynoso was in detention, an asylum officer interviewed her and she expressed fear of returning to Guatemala. The asylum officer concluded that she had established a credible fear of persecution and referred her to removal proceedings before an immigration judge. Diaz-Reynoso filed an application for withholding of removal and protection under CAT. In her counseled brief, Diaz-Reynoso defined her particular social group as "Guatemalan indigenous women who are unable to leave their relationship," and advanced evidence of a number of factors that prevented her from leaving.

The IJ issued a written decision denying Diaz-Reynoso's application for withholding of removal and relief under CAT. The IJ found Diaz-Reynoso credible, but concluded that because much of her account was inconsistent with her own testimony and other record evidence, "significant portions of her testimony [were] entitled to little weight." On the withholding claim, the IJ did not rule on whether Diaz-Reynoso established the existence of a cognizable particular social group, but concluded that she did not establish membership in her proffered particular social group, did not show that she would more likely than not suffer persecution,

and did not demonstrate that the Guatemalan government would be unable or unwilling to protect her. On her CAT claim, the IJ concluded that Diaz-Reynoso failed to establish she would more likely than not be tortured if removed to Guatemala, and that she did not demonstrate that her past abuse or feared future abuse would occur in the context of government control, authority, or acquiescence. The IJ further concluded that Diaz-Reynoso failed to seek protection from law enforcement, and found she could safely and reasonably avoid abusive conduct by relocating within Guatemala. Diaz-Reynoso timely appealed to the BIA.

The BIA dismissed Diaz-Reynoso's appeal. On withholding, the BIA did not rely on the IJ's rationale. Instead, the BIA concluded that Diaz-Reynoso's proposed particular social group was not cognizable in light of *Matter of A-B-*, 27 I. & N. Dec. at 316.[2] On CAT, the BIA concluded that Diaz-Reynoso had failed to establish that any Guatemalan public official would more likely than not consent to or acquiesce in any torture she may suffer.

## II

We have jurisdiction to review final orders of removal pursuant to 8 U.S.C. § 1252(a)(5). "Our review is limited to those grounds explicitly relied upon by the [BIA]." *Budiono v. Lynch*, 837 F.3d 1042, 1046 (9th Cir. 2016). Where the BIA writes its own decision, as it did here, we review the BIA's decision, except to the extent it expressly adopts the IJ's decision. *Rodriguez v. Holder*, 683 F.3d 1164, 1169 (9th Cir. 2012).

---

[2] The Attorney General decided *Matter of A-B-* after the IJ issued its decision, but before the BIA ruled on Diaz-Reynoso's appeal.

We review de novo the BIA's determinations on questions of law. *Pirir-Boc v. Holder*, 750 F.3d 1077, 1081 (9th Cir. 2014). We review for substantial evidence the BIA's factual findings, which "should be upheld 'unless the evidence compels a contrary result.'" *Budiono*, 837 F.3d at 1046 (quoting *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1184 (9th Cir. 2011)). Whether Diaz-Reynoso's particular social group is cognizable is a question of law. *Conde Quevedo v. Barr*, 947 F.3d 1238, 1242 (9th Cir. 2020); *see also Barbosa v. Barr*, 926 F.3d 1053, 1059 (9th Cir. 2019).

## III

To qualify for withholding of removal, a petitioner must demonstrate that, if removed to her home country, her life would be threatened on account of any one of five enumerated grounds: race, religion, nationality, membership in a particular social group, or political opinion. *Mendoza-Alvarez v. Holder*, 714 F.3d 1161, 1163–64 (9th Cir. 2013) (per curiam). At issue here is "membership in a particular social group"—specifically, the cognizability of Diaz-Reynoso's proffered social group. 8 U.S.C. § 1231(b)(3)(A); *see also Reyes v. Lynch*, 842 F.3d 1125, 1132 n.3 (9th Cir. 2016) (noting that establishing the "existence" of a cognizable social group is a separate requirement from establishing "membership" in the group).

The Attorney General's and the BIA's constructions of ambiguous statutory terms are entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Pirir-Boc*, 750 F.3d at 1081; *Jiang v. Holder*, 611 F.3d 1086, 1091–92 (9th Cir. 2010). Because we have already concluded that the phrase "particular social

group" is ambiguous, *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc), we must adhere to an agency interpretation of that term, so long as it is reasonable, *id.* at 1087. An interpretation fails this step if it is "arbitrary or capricious in substance." *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011) (quoting *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011)); *see also Gomez-Sanchez v. Sessions*, 892 F.3d 985, 993 (9th Cir. 2018).

**A**

The BIA first construed the phrase "particular social group" in *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985), *overruled in part on other grounds as stated in Matter of Mogharrabi*, 19 I. & N. Dec. 439, 441 (BIA 1987). There, the BIA explained that members of a particular social group must share a "common, immutable characteristic." *Id.* at 233. An immutable characteristic is one that is either: (1) "beyond the power of an individual to change," or (2) "so fundamental to [individual] identity or conscience that it ought not be required to be changed." *Id.* at 233–34.

Over time, "*Acosta*'s immutable characteristic test 'led to confusion and a lack of consistency as adjudicators struggled with various possible social groups, some of which appeared to be created exclusively for asylum purposes.'" *Reyes*, 842 F.3d at 1134 (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 231 (BIA 2014)). Thus, beginning with *Matter of C-A-*, 23 I. & N. Dec. 951, 957–59 (BIA 2006), the BIA refined the *Acosta* standard by stating that an applicant must also demonstrate that his or her proposed particular social group has "social visibility" and "particularity." *See*

*Henriquez-Rivas*, 707 F.3d at 1084; *see also Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. 69, 74–76 (BIA 2007).

The BIA later reaffirmed that these concepts—particularity and social visibility—are distinct requirements for establishing membership in a cognizable social group. *Matter of S-E-G-*, 24 I. & N. Dec. 579, 582 (BIA 2008); *Matter of E-A-G-*, 24 I. & N. Dec. 591, 594 (BIA 2008). In 2014, the BIA continued to refine these concepts with its decisions in *Matter of M-E-V-G-*, 26 I. & N. Dec. at 227, and *Matter of W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014). *See Reyes*, 842 F.3d at 1135–37. The BIA explained that the particularity inquiry recognizes that the social group must be defined by characteristics that provide a clear benchmark for determining who falls within the group, such that the group possesses "discrete and . . . definable boundaries." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 239. Social visibility, later renamed "social distinction," considers whether those with a common immutable characteristic are "set apart, or distinct, from other persons within the society in some significant way." *Id.* at 238. As a result of this precedent, it is now well-established that an applicant seeking relief based on membership in a particular social group must establish that the group is: "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Id.* at 237.

In 2014, the BIA also decided *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014). There, the BIA recognized as cognizable the proposed social group of "married women in Guatemala who are unable to leave their relationship." *Id.* at 389. Critically, in *Matter of A-R-C-G-*, the Government conceded the petitioner had "established that she suffered past

harm rising to the level of persecution and that the persecution was on account of" her particular social group. *Id.* at 390. Although the BIA cited as controlling its recent decisions in *Matter of M-E-V-G-* and *Matter of W-G-R-*, it relied in large part on the Government's concession that the group was cognizable. *Id.* at 392–95.

**B**

This appeal concerns the Attorney General's recent interpretation of "particular social group" in *Matter of A-B-*, 27 I. & N. Dec. at 317. There, the Attorney General reviewed a BIA decision that concluded the applicant's social group—"El Salvadoran women who are unable to leave their domestic relationships where they have children in common"—was cognizable. *Id.* at 317, 321; *see also* 8 C.F.R. § 1003.1(h)(1). In its review of A-B-'s appeal, the BIA had relied heavily on its earlier precedential decision in *Matter of A-R-C-G-*, 26 I. & N. Dec. at 388, so it was necessary for the Attorney General to review that decision as well. *Matter of A-B-*, 27 I. & N. Dec. at 321. Ultimately, the Attorney General overruled *Matter of A-R-C-G-*, concluding that it impermissibly deviated from the BIA's prior precedent. *Matter of A-B-*, 27 I. & N. Dec. at 317, 333, 340; *see also* 8 C.F.R. § 1003.1(d)(7), (g)(1).

The Attorney General found *Matter of A-R-C-G-*'s reasoning to be lacking because the BIA failed to engage in the rigorous analysis required to properly analyze a particular social group. *Matter of A-B-*, 27 I. & N. Dec. at 331. The Attorney General concluded that *Matter of A-R-C-G-* "recognized a new particular social group without correctly applying the[] standards" for asylum, *id.* at 317, and "[t]o the extent that the Board examined the legal questions," rather

than relying on the Government's concessions, "its analysis lacked rigor and broke with the Board's own precedents," *id.* at 333.

The Attorney General identified several specific errors in the BIA's analysis of the particular social group at issue in *Matter of A-R-C-G-*. First, "[t]o be cognizable, a particular social group *must* 'exist independently' of the harm asserted." *Id.* at 334 (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. at 236 n.11). In the Attorney General's view, the BIA had "avoided considering whether [the petitioner] could establish the existence of a cognizable particular social group without defining the group by the fact of persecution." *Id.* In particular, the Attorney General opined that the BIA never considered that the group "was effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability 'to leave' was created by harm or threatened harm." *Id.* at 335.

Second, the Attorney General reiterated the precedent establishing that not every immutable characteristic is sufficiently precise to define a particular social group. *Id*. The Attorney General questioned the viability of "[s]ocial groups defined by their vulnerability to private criminal activity" because those groups "likely lack" particularity "given that broad swaths of society may be susceptible to victimization." *Id.* The Attorney General observed that the BIA did not engage with this analysis in *Matter of A-R-C-G-*; it merely concluded that the terms used to describe the group had "commonly accepted definitions within Guatemalan society." *Id.*

Third, the BIA "provided no explanation for why it believed that [the] evidence established that Guatemalan

society" perceived the proposed social group to be distinct, and erred by accepting the Government's concession as to distinction. *Id.* at 336. The Attorney General found the record lacking on this point and concluded there was significant room for doubt that Guatemalan society viewed the women comprising the social group "as members of a distinct group in society, rather than each as a victim of a particular abuser in highly individualized circumstances." *Id.*

After overruling *Matter of A-R-C-G-*, the Attorney General described the BIA's reasoning in *Matter of A-B-* as similarly cursory because it consisted of general citations to *Matter of A-R-C-G-* and country condition reports. *Id.* at 340. The Attorney General vacated the BIA's decision in *Matter of A-B-* and remanded the case to the BIA for further analysis "under the standards articulated in [the *Matter of A-B-*] opinion and in past Board decisions." *Id.* at 340–41, 346.

Separate from its holding, *Matter of A-B-* included several broad observations about asylum claims brought by "victims of private criminal activity." *Id.* at 317. For example, the Attorney General acknowledged that "there may be exceptional circumstances when victims of private criminal activity could meet" the requirements for asylum, *id.*, but also suggested that, "[g]enerally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum," *id.* at 320.

In the end, *Matter of A-B-* reaffirmed existing standards for establishing membership in a particular social group, and overruled *Matter of A-R-C-G-* because of its failure to comply with the BIA's precedents regarding those requirements. Indeed, the Attorney General has since described *Matter of A-B-* in precisely this manner. *Matter of L-E-A-*, 27 I. & N.

Dec. 581, 588–89 (A.G. 2019) (recognizing that in *Matter of A-B-*, the Attorney General "reaffirmed" and "reiterated" the established framework for analyzing the cognizability of particular social groups, and "emphasized the importance of a rigorous application of that legal standard").

## IV

On Diaz-Reynoso's withholding claim, the BIA ruled that her proposed social group was not cognizable in light of the Attorney General's decision in *Matter of A-B-*. On appeal, Diaz-Reynoso contends that the Attorney General's decision in *Matter of A-B-* is not entitled to *Chevron* deference because it is arbitrary and capricious. Diaz-Reynoso raises two principal arguments: (1) *Matter of A-B-* runs counter to the Immigration and Nationality Act's (INA) scheme for bars to withholding; and (2) in *Matter of A-B-*, the Attorney General eliminated the requirement that particular social groups be evaluated on a case-by-case basis. Neither argument is persuasive.

## A

Diaz-Reynoso first argues that *Matter of A-B-* is arbitrary and capricious because it announced a new rule that amounts to a categorical ban on withholding of removal for victims of domestic violence, and therefore runs counter to the INA's scheme, which provides for only narrow and expressly enumerated exceptions to withholding. Diaz-Reynoso's argument is that the Attorney General essentially added a new exception to withholding of removal claims.

Diaz-Reynoso is correct that withholding of removal is generally mandatory "if an alien 'establish[es] that it is more

likely than not that [she] would be subject to persecution on one of the specified grounds.'" *INS v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999) (first alteration in original) (quoting *INS v. Stevic*, 467 U.S. 407, 429–30 (1984)); *see also* 8 U.S.C. § 1231(b)(3)(A). And the statute has specific exceptions embodied in 8 U.S.C. § 1231(b)(3)(B). *See Aguirre-Aguirre*, 526 U.S. at 419. For example, an applicant is barred from obtaining withholding relief when he or she has been convicted of a particularly serious crime, 8 U.S.C. § 1231(b)(3)(B)(ii), or when there are serious reasons to believe that he or she committed a serious nonpolitical crime before arriving in the United States, *id.* § 1231(b)(3)(B)(iii). *See also Gomez-Sanchez*, 892 F.3d at 990; *Go v. Holder*, 640 F.3d 1047, 1052 (9th Cir. 2011).

We recognize that the Attorney General began the opinion in *Matter of A-B-* by offering some general impressions about asylum and withholding claims based on domestic violence and other private criminal activity. *See* 27 I. & N. Dec. at 320. For example, the Attorney General observed that "*[g]enerally*, claims by aliens pertaining to domestic violence . . . perpetrated by non-governmental actors will not qualify for asylum," and "in practice such claims are *unlikely* to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address." *Id.* (emphasis added). But the holding of *Matter of A-B-* plainly does not endorse any sort of categorical exception based on these remarks and observations. In fact, the Attorney General explicitly stated: "I do not decide that violence inflicted by non-governmental actors may never serve as the basis for an asylum or withholding application based on membership in a particular social group." *Id.* Far from endorsing a categorical bar, the Attorney General emphasized that the

BIA must conduct the "rigorous analysis" set forth in the BIA's precedents. *Id.* at 340.[3]

Despite the general and *descriptive* observations set forth in the opinion, the Attorney General's *prescriptive* instruction is clear: the BIA must conduct the proper particular social group analysis on a case-by-case basis. Indeed, had the Attorney General announced a categorical rule, there would have been no reason to remand *Matter of A-B-* to the BIA for analysis "under the standards articulated in this opinion and in past Board decisions." *Id.* In *Matter of A-B-*, the Attorney General did not announce a new categorical exception for victims of domestic violence or other private criminal activity.

**B**

Diaz-Reynoso next argues that the Attorney General's opinion in *Matter of A-B-* is arbitrary and capricious because it marks a dramatic and unexplained departure from the BIA's longstanding recognition that particular social group determinations must be individualized and conducted on a

---

[3] Like Diaz-Reynoso, the dissent focuses on the Attorney General's observation that claims based on domestic violence "are unlikely to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address." *Id.* at 320. But the Attorney General explicitly declined to decide that violence "inflicted by non-governmental actors may never serve as the basis" for asylum or withholding relief. *Id.* Indeed, though such applicants face numerous hurdles—e.g., establishing the existence of a particular social group, membership in that group, persecution on account of that membership, and persecution that a government is unwilling or unable to control—the Attorney General recognized that "there may be exceptional circumstances when victims of private criminal activity could meet these requirements." *Id.* at 317.

case-by-case basis. This argument is based on a misreading of *Matter of A-B-*.

In *Matter of A-B-*, the Attorney General reaffirmed the BIA's existing framework for analyzing the cognizability of particular social groups, and faulted the BIA for failing to apply it. *See* 27 I. & N. Dec. at 331. Under the BIA's established standards, social groups must "be determined on a case-by-case basis." *Matter of Acosta*, 19 I. & N. Dec. at 233; s*ee also, e.g.*, *Matter of M-E-V-G-*, 26 I. & N. Dec. at 251. On this point, the Attorney General was not subtle. *Matter of A-B-* reminded the BIA to "perform[] the detailed analysis required" by the BIA's precedents, emphasizing that "[s]uch claims must be carefully analyzed under the standards articulated in [*Matter of A-B-*] and in past Board decisions." 27 I. & N. Dec. at 332, 340. "Neither immigration judges nor the Board may avoid the rigorous analysis required in determining asylum claims . . . ." *Id.* at 340. *Matter of A-B-* did not announce a bright-line rule concerning applications based on domestic violence; in fact, it underscored the need for an intensive case-by-case analysis. Accordingly, we decline to hold that the Attorney General's decision in *Matter of A-B-* was arbitrary or capricious.

## V

## A

Diaz-Reynoso next argues that, even if *Matter of A-B-* did not establish a categorical rule barring relief for victims of domestic violence and other private criminal activity, the BIA misapprehended the scope of the Attorney General's holding in *Matter of A-B-*. On this point, we agree with Diaz-Reynoso. The BIA seems to have erroneously understood

*Matter of A-B-* to forbid any mention of feared harm within a proposed social group.

With almost no analysis, the BIA rejected Diaz-Reynoso's proposed particular social group because it "suffer[ed] from the same circularity problem articulated by the Attorney General in *Matter of A-B-*." But *Matter of A-B-* did not announce a new rule concerning circularity, or identify a categorical "circularity problem." It merely reiterated the well-established principle that a particular social group must exist independently of the harm asserted, and that the BIA must consider whether a petitioner's social group is cognizable if it is defined without reference to the fact of persecution. *Matter of A-B-*, 27 I. & N. Dec. at 334–35. If a group is otherwise cognizable, *Matter of A-B-* does not demand that it be devoid of any reference to an applicant's claimed persecution. To the contrary, *Matter of A-B-* reiterated the longstanding rule that persecution may be relevant to a group's social distinction. The BIA's precedents, as well as our own, make this clear.

*Matter of A-B-* restated the rule that "a particular social group *must* 'exist independently' of the harm asserted in an application for asylum or statutory withholding of removal," 27 I. & N. Dec. at 334 (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. at 236 n.11), and "individuals in the group must share a narrowing characteristic other than their risk of being persecuted," *id.* at 335 (quoting *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005)). This principle finds its genesis in the BIA's 2006 decision in *Matter of C-A-*, 23 I. & N. Dec. at 957–61.

*Matter of C-A-* discussed the importance of social distinction (then called social visibility) to the particular

social group analysis. *Id.* at 959–60. The BIA cited the guidelines adopted by the United Nations High Commissioner for Refugees (UNHCR) for establishing membership in a particular social group, and observed that the guidelines "confirm that 'visibility' is an important element in identifying the existence of a particular social group." *Id.* at 960 (citing UNHCR Guidelines ¶¶ 2, 14).[4] The BIA explained that "a social group cannot be defined *exclusively* by the fact that it is targeted for persecution," but said nothing to suggest that the mention of feared harm somehow disqualifies an otherwise cognizable group. *Id.* (quoting UNHCR Guidelines ¶ 2). In fact, the BIA explained that "persecutory action toward a group may be a relevant factor in determining the *visibility* of a group in a particular society." *Id.* (quoting UNHCR Guidelines ¶ 14).

Subsequent BIA decisions in 2007 and 2008 repeated this refrain. *See, e.g.*, *Matter of S-E-G-*, 24 I. & N. Dec. at 584 (observing that although a particular social group cannot be "defined exclusively by the fact that its members have been subjected to harm in the past . . . [,] this may be a relevant factor in considering the group's visibility in society" (citing *Matter of C-A-*, 23 I. & N. Dec. at 960)); *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. at 74 ("Although a social group cannot be defined exclusively by the fact that its members have been subjected to harm, . . . this may be a relevant factor in considering the group's visibility in society." (citing *Matter of C-A-*, 23 I. & N. Dec. at 960)). In 2014, the BIA in

---

[4] "UNHCR Guidelines" refers to UNHCR, Guidelines on International Protection: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees, U.N. Doc. HCR/GIP/02/02 (May 7, 2002), *available at* https://www.unhcr.org/3d58de2da.pdf.

*Matter of M-E-V-G-* reaffirmed that the requirement that "the social group must exist independently of the fact of persecution" was "well established in [its] prior precedents and is already a part of the social group analysis." 26 I. &. N. Dec. at 236 n.11 (citing *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. at 74); *see also Matter of W-G-R-*, 26 I. & N. Dec. at 215 ("Persecutory conduct aimed at a social group cannot alone define the group, which must exist independently of the persecution." (citing *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. at 74)).[5]

The Attorney General's opinion in *Matter of A-B-* reaffirmed this line of authority for assessing the cognizability of particular social groups, citing the BIA's prior articulations of the rule in cases like *Matter of M-E-V-G-*, 26 I. &. N. Dec. at 236 n.11, and *Matter of W-G-R-*, 26 I. & N. Dec. at 215, and the Sixth Circuit's decision in

---

[5] Our sister circuits' published opinions have widely acknowledged the rule that persecution *alone* cannot define the social group. *See, e.g.*, *Perez-Rabanales v. Sessions*, 881 F.3d 61, 67 (1st Cir. 2018) ("[W]here a proposed group is defined *only* by the characteristic that it is persecuted, it does not qualify as a 'social group.'" (emphasis added) (citation omitted)); *Paloka v. Holder*, 762 F.3d 191, 198 (2d Cir. 2014) ("[A] particular social group is not cognizable *merely* because members have been subjected to harm . . . ." (emphasis added) (quotation marks and citations omitted)); *Orellana-Monson v. Holder*, 685 F.3d 511, 518–19 (5th Cir. 2012) ("[T]he risk of persecution *alone* does not create a particular social group . . . ." (emphasis added) (citation omitted)); *Rivera-Barrientos v. Holder*, 666 F.3d 641, 650 (10th Cir. 2012) ("[A] social group cannot be defined *exclusively* by the fact that its members have been subjected to harm . . . ." (emphasis added) (citation omitted)); *Jonaitiene v. Holder*, 660 F.3d 267, 271 (7th Cir. 2011) ("The social group . . . cannot be defined *merely* by the fact of persecution." (emphasis added)); *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1198 (11th Cir. 2006) ("The risk of persecution *alone* does not create a particular social group . . . ." (emphasis added)).

*Rreshpja*, which explained that the "individuals in the group must share a narrowing characteristic other than their risk of being persecuted." *Matter of A-B-*, 27 I. & N. Dec. at 334–35 (quoting *Rreshpja*, 420 F.3d at 556); *see also Matter of L-E-A-*, 27 I. & N. Dec. at 595 (observing that a proposed social group must have an "'existence independent of' the alleged persecutors," and that "the risk of persecution alone can never create a particular social group" (citation omitted)).  In *Rreshpja*, the court further observed that persecution may not be "the touchstone defining the group."  420 F.3d at 556 (citation omitted).  The group at issue in *Rreshpja*—young, attractive Albanian women who were forced into prostitution—lacked a "narrowing characteristic" because, if viewed without reference to being forced into prostitution, the proposed group would allow "virtually any young Albanian woman who possesse[d] the subjective criterion of being 'attractive'" to obtain asylum.  *Id.*; *see also Matter of A-B-*, 27 I. & N. Dec. at 335.

## B

Despite this solid and consistent line of precedent, on appeal the Government and dissent defend the BIA's summary rejection of Diaz-Reynoso's particular social group on the grounds that it "suffers from the same circularity problem articulated by the Attorney General in *Matter of A-B-*."  They concede that the fact of persecution may be relevant to social distinction in a particular society, but insist that a proposed particular social group may not include mention of feared persecution.  In the Government's and dissent's view, in order to exist independently from the petitioner's feared harm, a proposed group may not refer to that harm at all.  We disagree.  The idea that the inclusion of persecution is a sort of poison pill that dooms any group does

not withstand scrutiny. *See Matter of C-A-*, 23 I. & N. Dec. at 960 (confirming that "'visibility' is an important element in identifying the existence of a particular social group," and that "persecutory action toward a group may be a relevant factor in determining the *visibility* of a group in a particular society" (citation omitted)).

The BIA has taken pains to state that "the shared trait of persecution does not disqualify an otherwise valid social group." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 243 (citing *Cece v. Holder*, 733 F.3d 662, 671 (7th Cir. 2013) (en banc)); *see also Paloka*, 762 F.3d at 198. Though "persecutory conduct *alone* cannot define the group," *Matter of M-E-V-G-*, 26 I. & N. Dec. at 242 (emphasis added); *see also id.* at 243 (a particular social group "cannot be defined *merely* by the fact of persecution" (quoting *Cece*, 733 F.3d at 671)), persecution itself "may be the catalyst that causes" a society to distinguish a group in a meaningful way and consider it distinct, *id.* at 243; *see also supra* Part V.A.

Because BIA precedent dictates that a particular social group cannot be defined "exclusively" by harm, the Government and dissent insist that BIA precedent does not permit a group to include any mention of harm. To reach this conclusion, they ignore the word "exclusively"—along with similar limiting language in the BIA's decisions and those from our sister circuits, *supra* Part V.A—and argue that in order for a group to "exist independently" from harm, its description must not refer to harm at all. But as we have explained, BIA precedent confirms that a group that exists independent of persecution is simply a group that shares an immutable characteristic *other than* the persecution it suffers—i.e., a group that shares a "narrowing characteristic." *Matter of A-B-*, 27 I. & N. Dec. at 335 (quoting *Rreshpja*,

420 F.3d at 556); *Matter of W-G-R-*, 26 I. & N. Dec. at 215; *see also Matter of L-E-A-*, 27 I. & N. Dec. at 595.

The BIA articulated an example in *Matter of M-E-V-G-* that leaves no room for doubt on this score.[6]  There, the BIA posited that a proposed social group composed of former employees of a country's attorney general may not be valid for asylum purposes, even though the group is discrete and the members' shared past experience is immutable, because "the society may not consider these employees to be meaningfully distinct within society in general." *Id.* at 242. However, the BIA explained, if the government began persecuting those people, it is possible that society would then discern that this group of individuals is distinct in some significant way. *Id.* at 243.  In this example, the act of persecution by the government causes the society to recognize the former employees as distinct, "but the immutable characteristic of their shared past experience exists independent of the persecution." *Id.*

The UNHCR Guidelines provide a similar example concerning left-handed people.[7]  Left-handed people possess an immutable characteristic that is defined with particularity, but the group lacks social distinction—that is, the relevant society may not consider the characteristic to set apart the group in a meaningful way. *See* UNHCR Guidelines ¶ 14. If, however, left-handed people were subjected to persecution

---

[6] This example is drawn from the Seventh Circuit's decision in *Sepulveda v. Gonzales*, 464 F.3d 770, 771 (7th Cir. 2006).

[7] The BIA has recognized that although the views of the UNHCR are not binding, they "are a useful interpretative aid." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 248.

*because* they were left-handed, their immutable characteristic could become recognizable and distinct within their society. *Id.* In this example, it is the attribute of being left-handed—and not the persecutory acts—that would identify members of this particular social group. *Id.* Thus, the group possesses an underlying immutable characteristic, the fact of persecution establishes the group's distinction within the relevant society, and because the group's members can be identified by means other than the feared persecution, it shares a narrowing characteristic and is cognizable.[8]

If we were to follow the reasoning suggested by the Government and dissent, neither the BIA's group of former employees of a country's attorney general, nor the UN High Commissioner's group of left-handed people, would be cognizable if members of those groups included mention of their feared persecution in their proposed social groups. The particular formulation of the groups—e.g., "former employees of the attorney general" versus "former employees of the attorney general, who are being hunted down and killed," or "left-handed people" versus "left-handed people who have been persecuted"—makes all the difference to the group's cognizability for the Government and dissent because, in their view, groups that include mention of feared harm cannot exist independently of that harm.

Though it cannot be contested that persecution may be relevant to a group's social distinction, the dissent argues that the "group itself" cannot "be defined in some way by that persecution," and the Government echoes this view.

---

[8] This example is borrowed from a "widely cited" decision. UNHCR Guidelines ¶ 14 (citing *Applicant A v. Minister for Immigration and Ethnic Affairs* (1997) 190 CLR 225, 264 (Austl.)).

In advancing this argument, the Government and dissent confuse the definition of a "particular social group" with one of its components—i.e., the group's shared immutable characteristic—and thereby treat every element of a proposed social group as necessary to the group's immutable characteristic. This is contrary to BIA precedent, which unequivocally establishes that a group's persecution may be relevant to a different component: social distinction. *See Matter of M-E-V-G-*, 26 I. & N. Dec. at 242–43. Further, it is important to recognize that the question is not whether feared persecution can serve as an immutable characteristic; the question is whether mention of feared persecution disqualifies an otherwise cognizable social group.

The Government and dissent argue that by failing to treat harm as integral to a social group's definition—i.e., by failing to treat it as part of the group's shared immutable characteristic—we advocate a rule that allows courts to impermissibly rewrite proposed social groups. *See Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. 189, 191–92 (BIA 2018) (noting that a petitioner must delineate his or her proposed social group before the IJ, and may not reframe the group on appeal). We agree that courts cannot rewrite proposed social groups, but nothing requires us to analyze them as mechanistically as the dissent and Government urge.

As we have explained, the BIA's precedent establishes that we may consider the entirety of a proffered social group to determine whether the petitioner has established all the requirements for a cognizable group: an immutable characteristic, particularity, and social distinction. *Matter of M-E-V-G-*, 26 I. & N. Dec. at 227. We do not rewrite the petitioner's proposed social group by recognizing that the mention of harm in a proposed social group may be relevant

to the group's social distinction, nor does this prevent us from examining whether the petitioner's proffered group shares an immutable characteristic *other than* harm. To be sure, it is the applicant's burden to demonstrate the existence of a cognizable particular social group. *Reyes*, 842 F.3d at 1132 n.3; *see also Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. at 191 (noting that "it is an applicant's burden to specifically delineate her proposed social group"); *Matter of A-T-*, 25 I. & N. Dec. 4, 10 (BIA 2009). And it is the applicant's burden to establish membership in that group. *Reyes*, 842 F.3d at 1132 n.3. But nothing in the precedential framework constrains the petitioner to specifying a proposed group that mentions only the proffered immutable characteristic, and no more.

The purpose of asylum and withholding is to provide relief to people who have been persecuted in foreign lands because of their race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. §§ 1158(b)(1)(B)(i), 1231(b)(3)(A); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 423–24, 427–29 (1987). The Government and dissent do not explain why a person seeking relief on the basis of membership in a particular social group should be required to omit any mention of threatened persecution. Notably, the rule they propose is not limited to victims of domestic violence. Under the interpretation urged by the Government and dissent, a Tutsi fleeing Rwanda during the Rwandan Civil War would be denied relief if he or she included in the description of the Tutsi social group that Tutsis had been targeted in a campaign of genocide. *See Donchev v. Mukasey*, 553 F.3d 1206, 1220 (9th Cir. 2009) ("When the Hutus in Rwanda murdered as many Tutsis as they could, the persecution was not on account of 'race, religion, nationality, . . . , or political opinion,'" but "being Tutsi . . . fits well into the 'particular social group'

category."   (first alteration in original) (quoting 8 U.S.C. § 1101(a)(42)(A))).  Tellingly, the dissent's only response to this hypothetical is that such person fleeing genocide would not need to mention that harm because he or she could rely on Tutsi ethnicity to establish group membership.  Of course they could, and that is precisely the point; the mere mention of harm does not categorically disqualify an otherwise cognizable social group.

The dissent asserts that no court has endorsed the view that a proposed social group is not disqualified if it includes mention of feared persecution.  But the most recent decision doing so is *Grace v. Barr*, — F.3d —, 2020 WL 4032652 (D.C. Cir. 2020).  There, the Government argued that a group "must be separate from the harm, not consisting of the harm, even in part," and the D.C. Circuit rejected this argument as "flatly inconsistent" with *Matter of A-B-*.  *Id.* at *16 (internal quotation marks omitted); *see also id.* (noting the Government's concession at oral argument that the group "Guatemalan women unable to leave their relationships" would not be "categorically barred," and that "its validity would turn on the specific factual circumstances of an applicant's claim").

The case-by-case approach we describe is the very one articulated by *Matter of A-B-*.  There, the Attorney General faulted the BIA's decision in *Matter of A-R-C-G-* because it "avoided considering whether [the petitioner] could establish the existence of a cognizable particular social group without defining the group by the fact of persecution."  *Matter of A-B-*, 27 I. & N. Dec. at 334.  The Attorney General explained that members of a cognizable group "must share a *narrowing* characteristic *other than* their risk of being persecuted."  *Id.* at 335 (emphasis added) (quoting *Rreshpja*,

420 F.3d at 556); *see also, e.g.*, *Sarhan v. Holder*, 658 F.3d 649, 655 (7th Cir. 2011) (concluding that proposed social group of "women in Jordan who have (allegedly) flouted repressive moral norms, and thus who face a high risk of honor killing" was cognizable because it was not defined solely by its risk of persecution); *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1310 (11th Cir. 2013) (concluding that proposed social group of "members of a family targeted by a drug-trafficking organization because a family member sought criminal justice against a member of the drug-trafficking organization" was not cognizable because its "defining attribute" was its persecution, and the "risk of persecution alone does not create a particular social group" (citation omitted)); *Matter of S-E-G-*, 24 I. & N. Dec. at 584, 588 (concluding that proposed social group of "young Salvadorans who have been subject to recruitment efforts by criminal gangs" was not cognizable because aside from being "subjected to harm in the past (i.e., forced gang recruitment and any violence associated with that recruitment)," the proposed group lacked a common immutable characteristic).

If the petitioners' mere reference to harm defeated these proposed social groups, any further analysis of the groups would have been unnecessary. As the D.C. Circuit recognized in *Grace*, *Matter of A-B-* requires a "careful[]" examination of a group to "ascertain whether it contains any attributes that 'exist independently of the harm asserted.'" 2020 WL 4032652, at *14–15. This is because a group "exists independently of the harm suffered" so long as persecution is not "what defines the contours of the group." *See id.* at *2 (citation omitted).

We recognize that, consistent with *Matter of A-B-*, numerous courts have deemed proposed social groups that referred to feared harm to be impermissibly circular. In some circumstances, this will be the correct result. Nothing in our analysis negates the precedent establishing that a group may be deemed impermissibly "circular" if, after conducting the proper case-by-case analysis, the BIA determines that the group is "defined exclusively by the fact that its members have been subjected to harm." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 242 (quoting *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. at 74). Courts have frequently held, after proper analysis, that groups lacking a common characteristic aside from persecution are not cognizable. *See, e.g.*, *Amezcua-Preciado v. U.S. Att'y Gen.*, 943 F.3d 1337, 1345 (11th Cir. 2019) (concluding that proposed group lacked a "'narrowing characteristic' other than the[] risk of being persecuted"); *Melnik v. Sessions*, 891 F.3d 278, 286 (7th Cir. 2018) (concluding that, other than persecution, "the only common characteristic of members of the proffered class [was] their status as small business owners"); *Rreshpja*, 420 F.3d at 556 (concluding that, aside from the fact of persecution, the group included all "young, attractive Albanian women"). These groups may also suffer from other deficiencies, such as a lack of particularity or social distinction, but this appeal does not require that we consider those aspects of the particular social group analysis. Here, we clarify that the conclusion that a proposed social group is impermissibly circular may not be reached summarily merely because the proposed group mentions harm.

The dissent cites to a plethora of unpublished decisions that rejected groups similar to the one advanced here, arguing that our decision is inconsistent with them.[9]  The dissent's reliance on these decisions reflects its mistaken premise that the rejection of a social group in one case suggests that a similar group may be rejected summarily in another.  This accounts for the dissent's approval of the BIA's one-sentence analysis in this case.  But it also contravenes binding authority establishing that whether a particular social group is cognizable "requires a fact-specific inquiry based on the evidence in a particular case."  *Matter of L-E-A-*, 27 I. & N. Dec. at 591.

The dissent also conflates the requirement to show nexus with the requirements for establishing a particular social group, and argues that if petitioners were allowed to include mention of their claimed persecution, they would somehow be relieved of the burden to establish a nexus between the persecution and their membership in the group.  What the dissent overlooks is that this is only a concern if social groups are "defined *exclusively*" by the harm the petitioners identify. *Matter of C-A-*, 23 I. & N. Dec. at 960 (quoting UNHCR Guidelines ¶ 14).  If the only immutable characteristic is a feared harm, the group becomes an impermissible "'catch all' applicable to all persons fearing persecution."  *Id.* (citing UNHCR Guidelines ¶ 2); *see also Castillo-Arias*, 446 F.3d at 1198.    That  problem  does  not  exist  if  a  narrowing

---

[9] Unpublished decisions are not precedent precisely because they are "not written in a way that will be fully intelligible to those unfamiliar with the case, and the rule of law is not announced in a way that makes it suitable for governing future cases." *Hart v. Massanari*, 266 F.3d 1155, 1178 (9th Cir. 2001).  Thus, contrary to the dissent's urging, we cannot discern the reasoning of those decisions simply from their outcome.

characteristic allows the group to be defined without reference to feared persecution. *Matter of A-B-* is clear on this point. 27 I. & N. Dec. at 335 (noting that a group defined by its persecution "moots the need to establish actual persecution," and it is *"[f]or this reason"* that the group members must share a "narrowing characteristic" (emphasis added) (citation omitted)).

## C

The BIA ruled that Diaz-Reynoso's proposed social group was not cognizable because it assumed her inability to leave her relationship was attributable to domestic violence, and because it understood *Matter of A-B-* to say that the mention of domestic violence disqualifies a particular social group. The BIA's decision consisted of a citation to *Matter of A-B-* and an assertion that Diaz-Reynoso's group suffered from the same "circularity problem" identified in that case. Without more, this was plainly contrary to the Attorney General's requirement that claims must be carefully analyzed under the framework established by the BIA's precedents. *Matter of A-B-*, 27 I. & N. Dec. at 331–32, 339–40; *see also Pirir-Boc*, 750 F.3d at 1084. There are no shortcuts.

There are at least two problems with the BIA's reasoning in Diaz-Reynoso's appeal. First, as explained, the BIA misunderstood *Matter of A-B-*'s holding. Second, it is not clear that the reason Diaz-Reynoso was "unable to leave" her relationship was limited to domestic violence. Rather, the BIA assumed that domestic violence was the only reason

Diaz-Reynoso was unable to leave her relationship. The dissent makes the same assumption.[10]

Diaz-Reynoso described her particular social group as "indigenous women in Guatemala who are unable to leave their relationship." The persecution Diaz-Reynoso fears is undoubtedly the abuse perpetrated by her husband, but before the immigration judge, she advanced evidence of economic, societal, and cultural factors that also may have prevented her from leaving her relationship. These included her financial dependence on her husband, limited education, rural location, and an ingrained Mayan cultural view that a relationship does not end until the man so agrees.[11] Contrary to the dissent's assertion, Diaz-Reynoso identified these factors in her brief to the BIA.

The IJ made no findings about the cognizability of Diaz-Reynoso's particular social group. Instead, the IJ ruled that Diaz-Reynoso failed to establish her *membership* in her

---

[10] The dissent states that the IJ "made clear that the entire basis for petitioner's proposed social group was her fear of domestic violence." This is incorrect. The IJ made no findings about the basis for Diaz-Reynoso's proposed social group, and instead relied on her inability to show membership in the group she advanced. The dissent also attributes a finding to the BIA that it did not make—that Diaz-Reynoso's inability to leave "was created by harm or threatened harm." The BIA did not make this ruling, and we cannot supply our own reasoning in lieu of that actually offered by the BIA. *See, e.g.*, *Recinos De Leon v. Gonzales*, 400 F.3d 1185, 1189 (9th Cir. 2005).

[11] There are many reasons a petitioner might be unable to leave a relationship, including a variety of "cultural, societal, religious, economic, or other factors." *De Pena-Paniagua v. Barr*, 957 F.3d 88, 94 (1st Cir. 2020); *see also Grace*, 2020 WL 4032652, at *14–15; *Amezcua-Preciado*, 943 F.3d at 1345.

proposed social group because she did not establish she was unable to leave her relationship. On appeal, the BIA relied on entirely different grounds. It plucked one fact identified by Diaz-Reynoso—that her husband physically abused her—and ruled that her proposed social group, which it presumed to be premised solely on domestic violence, suffered from the same "circularity problem" identified in *Matter of A-B-*. By reaching this conclusion without engaging in the analysis underscored by the Attorney General, the BIA committed the very same error it made in *Matter of A-B-*. *See Matter of A-B-*, 27 I. & N. Dec. at 331, 340; *see also Grace*, 2020 WL 4032652, at *15 (noting that "whether a given group is circular depends on the facts of the particular case").

Even if Diaz-Reynoso's social group necessarily incorporated her husband's physical abuse, the best indication that this does not categorically disqualify her social group is that the Attorney General remanded *Matter of A-B-* for the BIA to conduct a proper analysis. 27 I. & N. Dec. at 340. The group at issue in *Matter of A-B-* was "El Salvadoran women who are unable to leave their domestic relationships where they have children in common." *Id.* at 321. Rather than simply invalidating that group, the Attorney General remanded so the group could be "carefully analyzed under the standards articulated in this opinion and in past Board decisions, such as *M-E-V-G-* and *W-G-R-*." *Id.* at 340.

The dissent brushes aside the Attorney General's remand in *Matter of A-B-*, arguing the remand in that case was nothing more than "standard remand language," and urging that *Matter of A-B-* reiterated a rule that any mention of harm disqualifies a social group as impermissibly circular without further analysis. Accepting this interpretation would require us to ignore the Attorney General's clear language about the

mistakes made in *Matter of A-B-*, including that we cannot "avoid the rigorous analysis required" by the BIA's precedents, *id.* at 340, as well as the Attorney General's acknowledgment that "there may be exceptional circumstances when victims of private criminal activity could meet" the requirements for relief, *id.* at 317. *See also id.* at 339 (observing that "any claim regarding the existence of a particular social group" must be evaluated "in the context of the evidence presented regarding the particular circumstances in the country in question" (citation omitted)). Because the BIA avoided the case-specific inquiry demanded by *Matter of A-B-* and the BIA's precedents, we grant Diaz-Reynoso's petition and remand her withholding claim.

**D**

Diaz-Reynoso argues that the panel should analyze her proposed particular social group under the proper framework in the first instance. We decline to do so.

A panel may only affirm on the grounds set forth in the BIA's decision. *Recinos De Leon*, 400 F.3d at 1189. When the BIA's decision "cannot be sustained upon its reasoning, [the court] must remand to allow the agency to decide any issues remaining in the case." *Andia v. Ashcroft*, 359 F.3d 1181, 1184 (9th Cir. 2004) (per curiam); *see also INS v. Ventura*, 537 U.S. 12, 16 (2002); *Azanor v. Ashcroft*, 364 F.3d 1013, 1021 (9th Cir. 2004).

**VI**

Diaz-Reynoso also sought relief pursuant to the Convention Against Torture. CAT's implementing regulations require the agency to consider "all evidence

relevant to the possibility of future torture," and we have reversed where the agency has failed to do so. *Parada v. Sessions*, 902 F.3d 901, 914–15 (9th Cir. 2018) (quoting 8 C.F.R. § 1208.16(c)(3)); *see also Cole v. Holder*, 659 F.3d 762, 771–72 (9th Cir. 2011); *Kamalthas v. INS*, 251 F.3d 1279, 1284 (9th Cir. 2001). Here, we conclude that the BIA failed to consider all relevant evidence, so we remand Diaz-Reynoso's CAT claim for further consideration.

To qualify for relief under CAT, an alien must establish it is more likely than not that he or she would be tortured if returned to the proposed country of removal. *Garcia-Milian v. Holder*, 755 F.3d 1026, 1033 (9th Cir. 2014) (citing 8 C.F.R. § 208.16(c)(2)). Torture is any act by which severe pain or suffering is intentionally inflicted for such purposes as obtaining information or a confession, punishing an act committed or one suspected of having been committed, intimidating or coercing, or for any reason based on discrimination of any kind. *Singh v. Whitaker*, 914 F.3d 654, 663 (9th Cir. 2019) (citing 8 C.F.R. § 1208.18(a)(1)).

Torture must be inflicted by, at the instigation of, or with the consent or acquiescence of, a public official or other person acting in an official capacity. *Zheng v. Ashcroft*, 332 F.3d 1186, 1188 (9th Cir. 2003) (citing 8 C.F.R. § 208.18(a)(1)). "Public officials acquiesce in torture if they: '(1) have awareness of the activity (or consciously close their eyes to the fact it is going on); and (2) breach their legal responsibility to intervene to prevent the activity because they are unable or unwilling to oppose it." *Barajas-Romero v. Lynch*, 846 F.3d 351, 363 (9th Cir. 2017) (quoting *Garcia-Milian*, 755 F.3d at 1034). The public official need not have actual knowledge of the specific incident of torture; instead, it is sufficient that the public official is aware that torture of

the sort feared by the applicant occurs and remains willfully blind to it. *Madrigal v. Holder*, 716 F.3d 499, 509 (9th Cir. 2013); *see also Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1059–60 (9th Cir. 2006).

Diaz-Reynoso, who was deemed generally credible, testified that she told a man in her community named Sebastian about Vasquez-Juarez abusing her. Sebastian was "like an assistant mayor" in Yamoj, and according to Diaz-Reynoso, he had the power to arrest Vasquez-Juarez but did not do so. Instead, Sebastian told her that the abuse she suffered was a personal problem. Diaz-Reynoso further testified that she witnessed her husband bribing Sebastian.

Diaz-Reynoso also reported her abuse to a man named Avelino, who she described as a mayor figure in her village. Avelino told Vasquez-Juarez that what he was doing was not right, but Vasquez-Juarez responded that Avelino could not tell him what to do because Vasquez-Juarez "kn[e]w the law[]." Diaz-Reynoso did not attempt to report the abuse to anyone else, as she lacked the resources to do so. Her mountain village was quite remote, with the nearest police station two hours away by car.

The BIA did not discuss the evidence that Diaz-Reynoso reported her abuse to two different authority figures in her remote, rural community and that neither of them helped her. The BIA's statement that it "consider[ed] all of the evidence," does not suffice in this context. *See Cole*, 659 F.3d at 772. Indeed, after briefing in this appeal was completed, the Government conceded that the BIA failed to discuss potentially dispositive evidence regarding the issue of governmental acquiescence, specifically acknowledging that the BIA failed to consider whether Sebastian and Avelino

qualified as public officials within the meaning of 8 C.F.R. § 208.18(a)(1). The Government agreed that remand is required under these circumstances. Accordingly, we remand for reconsideration of Diaz-Reynoso's CAT claim.

## VII

Contrary to the dissent's concern, there is no confusion about the next steps for this case. On the CAT claim, the Government now stipulates that the failure to consider the reports Diaz-Reynoso made to people in her village requires remand. On the withholding claim, the BIA may consider in the first instance Diaz-Reynoso's proffered social group under the required framework. *See Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. at 191; *see also Matter of L-E-A-*, 27 I. & N. Dec. at 591.[12] In addition or in the alternative, the BIA may choose to rule on the other issues Diaz-Reynoso appealed and briefed to the BIA—membership in her claimed social group, a clear probability of persecution, and persecution the Guatemalan government is unable or unwilling to control.

Our decision today confirms a rule that has already been firmly established in the BIA's decisions. Beginning with its 2006 decision in *Matter of C-A-*, the BIA's precedent has been premised on the rule that persecutory action taken toward a group can be relevant to that group's social visibility (now social distinction). It is equally clear that the mere mention of persecutory action does not defeat an otherwise

---

[12] Because the BIA cannot engage in fact-finding, 8 C.F.R. § 1003.1(d)(3), the BIA may find it necessary to remand for the IJ to decide any underlying factual issues. *Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. at 191.

cognizable social group. *Matter of A-B-* did not hold otherwise, and in fact expressly reaffirmed the BIA's longstanding precedent.

We remand Diaz-Reynoso's claims to the BIA for further consideration.

**PETITION FOR REVIEW GRANTED; REMANDED.**

---

BRESS, Circuit Judge, concurring in the judgment in part and dissenting in part:

In *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018), the Attorney General revisited a recurring problem in the area of immigration law: the circumstances under which victims of domestic violence may seek asylum or withholding of removal. The Attorney General recognized that domestic abuse is "vile" but determined that under our immigration laws, claims of persecution based on domestic violence will generally "not qualify" for relief. *Id.* at 320, 346. The court today purports to uphold *Matter of A-B-* but in fact largely disregards it, creating an uncertain legal landscape and widely opening the door to the types of claims *Matter of A-B-* said were largely unavailable.

Under the Immigration and Nationality Act (INA), "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, *membership in a particular social group*, or political opinion." 8 U.S.C. § 1231(b)(3)(A)

(emphasis added).  In *Matter of A-B-*, the Attorney General reiterated the government's longstanding approach to the ambiguous term "particular social group": "[t]o be cognizable, a particular social group *must* exist independently of the harm asserted in an application for asylum or statutory withholding of removal."  27 I. & N. Dec. at 334 (emphasis in original) (quotations omitted).  Because an applicant must show persecution "because of" (or, for asylum, "on account of") membership in a "particular social group," embedding the harm in the definition of the group itself would be impermissibly circular.  *Id.* at 335, 338.

In *Matter of A-B-*, the Attorney General determined that the Board of Immigration Appeals (BIA) erred in recognizing the proposed social group "married women in Guatemala who are unable to leave their relationship."  *Id.* at 319, 334.  The reason was that such a proposed group was impermissibly circular, "effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability 'to leave' was created by harm or threatened harm."  *Id.* at 335.  The Attorney General in *Matter of A-B-* was unequivocal: when these issues are "properly analyzed," it is "clear that the particular social group [is] not cognizable."  *Id.* at 334.

Citing domestic violence at the hands of her common-law husband, the petitioner in this case sought withholding of removal based on the proposed social group "indigenous women in Guatemala who are unable to leave their relationship."  Recognizing that *Matter of A-B-* presented an obvious obstacle to her claim, petitioner's primary argument on appeal is that the Attorney General's decision was arbitrary and capricious and unentitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council,*

*Inc.*, 467 U.S. 837 (1984). The court today rejects that challenge. But the majority nevertheless concludes that the BIA in this case misinterpreted *Matter of A-B-* in rejecting a proposed social group that is in all relevant respects identical to the proposed social group that the Attorney General squarely rejected in *Matter of A-B-*.

This is error, with far-reaching consequences. The BIA in this case did not misread *Matter of A-B-*; it just applied it. So what did the BIA do wrong, not only in this case but presumably in many cases in which substantially identical proposed social groups have been rejected under the clear reasoning of *Matter of A-B-*? The majority's opinion provides no clear answer to that question. The court's varying and inconsistent rationales share the common theme that they reflect an unfortunate misunderstanding of the INA's requirements and the longstanding BIA precedent interpreting them. Today's opinion thus upholds *Matter of A-B-* in name only, improperly overstepping the Attorney General while departing from decisions of other circuits, inviting confusion in this important area of law.

There is no doubt that domestic violence is a problem in countries around the world and that the conduct of petitioner's husband is deplorable. But our court and the BIA have long recognized that not every person who has experienced suffering in a foreign country is entitled to asylum or withholding of removal. In this case, the BIA simply applied an Attorney General opinion in *Matter of A-B-* that the majority otherwise holds is a valid interpretation of the INA. That should have been the beginning and end of this case.

I thus respectfully dissent from the majority's determination to grant the petition for review as to the withholding of removal claim.[1]

I

To appreciate the errors in the majority opinion, it is necessary to understand the statutory backdrop for the Attorney General's decision in *Matter of A-B-* and the reasoning that supported that opinion.

A

An applicant is entitled to withholding of removal "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The undefined phrase "particular social group," which also appears in the similarly worded asylum statute, *id.* §§ 1101(a)(42)(A), 1158(b)(1), has proven to be a source of considerable difficulty. *Reyes v. Lynch*, 842 F.3d 1125, 1134 (9th Cir. 2016); *Fatin v. INS*, 12 F.3d 1233, 1238 (3d Cir. 1993). We have therefore recognized that "particular social group" is an ambiguous term and that the agency is entitled to *Chevron* deference when interpreting it. *Henriquez-Rivas*

---

[1] The majority also remands to the BIA for consideration of petitioner's claim under the Convention Against Torture (CAT). I concur in this portion of the judgment because the government requested a remand to the BIA on petitioner's CAT claim. I do not, however, join in the majority's discussion of the merits of this claim because I find the discussion unnecessary given the government's remand request.

*v. Holder*, 707 F.3d 1081, 1083, 1087 (9th Cir. 2013) (en banc).

Over time, the BIA has expounded on what "particular social group" means. In *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985), and relying on the neighboring statutory references to "race," "religion," "nationality," and "political opinion," the BIA concluded that "particular social group" means "a group of persons all of whom share a common, immutable characteristic." *Id.* at 233. In the BIA's considered view, "whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.*

Due to persisting uncertainty, and after a series of intervening decisions, the BIA in *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014), and *Matter of W-G-R-*, 26 I. & N. Dec. 208, 212–18 (BIA 2014), refined two other requirements for a "particular social group." In addition to sharing an "immutable characteristic," the group must also be "defined with particularity" and "socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 237. "Particularity" means that the group "must be defined by characteristics that provide a clear benchmark for determining who falls within the group," must be "discrete and have definable boundaries," and "must not be amorphous, overbroad, diffuse, or subjective." *Matter of W-G-R-*, 26 I. & N. Dec. at 214. To be "socially distinct," a group "must be perceived as a group by society." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 240. In *Reyes*, we held that the BIA's construction of the "particularity" and "social distinction" requirements merited *Chevron* deference. 842 F.3d at 1133.

In *Matter of M-E-V-G-*, and particularly relevant here, the BIA explained that a proposed social group must still meet another separate requirement: "the social group must exist independently of the fact of persecution," a "criterion [that] is well established in our prior precedents." 26 I. & N. Dec. at 236 n.11; *see also Matter of W-G-R-*, 26 I. & N. Dec. at 215. The rationale for this requirement centers on the fact that an applicant must not only prove membership in a cognizable group, but a risk of persecution "on account of" (or "because of") "membership in the particular social group." *Reyes*, 842 F.3d at 1132 n.3; 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A), 1231(b)(3)(A).

This last requirement is known as the "nexus" requirement. *Reyes*, 842 F.3d at 1132 n.3. The majority in this case acknowledges the "well-established principle" that a social group "must exist independently of the harm asserted." Maj. Op. 20. But the majority does little to explain the rationale for that principle, which contributes to the misunderstandings in today's opinion. The logic of the rule is important to this case.

Because a petitioner must establish a nexus between the persecution and her membership in a proposed social group, she cannot bake into the definition of the group the very group-motivated persecution she must otherwise prove. That would create a circularity problem, because "[i]f a group is defined by the persecution of its members, then the definition of the group moots the need to establish actual persecution." *Matter of A-B-*, 27 I. & N. Dec. at 335. Defining a group by the harm, in other words, eliminates a petitioner's obligation to demonstrate persecution because of membership in the group, effectively satisfying the nexus requirement in every case.

This anti-circularity principle is not controversial and is fundamental in this area of immigration law. Indeed, the majority itself cites various cases from other circuits that have acknowledged this rule. *See, e.g.*, *Perez-Rabanales v. Sessions*, 881 F.3d 61, 67 (1st Cir. 2018) ("A sufficiently distinct social group must exist independent of the persecution claimed to have been suffered by the alien and must have existed before the alleged persecution began."); *Paloka v. Holder*, 762 F.3d 191, 196 (2d Cir. 2014) (explaining that a proposed social group "must exist independently of the persecution") (quoting *Matter of W-G-R-*, 26 I. & N. Dec. at 215); *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005) ("[A] social group may not be circularly defined by the fact that it suffers persecution."); Maj. Op. 22 n.5, 23 (citing these cases).

Various other cases make the same point. *See, e.g.*, *Amezcua-Preciado v. U.S. Attorney Gen.*, 943 F.3d 1337, 1343 (11th Cir. 2019) ("[T]he proffered group must be independent of, and cannot be defined by, the persecution."); *Gonzales-Veliz v. Barr*, 938 F.3d 219, 229 (5th Cir. 2019) ("[T]he social group must exist independently of the fact of persecution.") (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. at 236 n.11) (alteration in original); *Lukwago v. Ashcroft*, 329 F.3d 157, 172 (3d Cir. 2003) ("We agree that under the statute a 'particular social group' must exist independently of the persecution suffered by the applicant for asylum."). Perhaps tellingly, of the many court of appeals cases the majority cites on this point of law, Maj. Op. 22 n.5, all of them denied petitions for review with the exception of one, and that case only remanded to the BIA in light of intervening precedent.

B

In *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014), the BIA recognized as a particular social group "married women in Guatemala who are unable to leave their relationship." *Id.* at 392. In treating this proposed social group as cognizable, the BIA relied primarily on the government's concessions "that a particular social group exist[ed]" and that the proposed group was "defined with particularity." *Id.* at 393–94. Based on *A-R-C-G-*, the BIA then began to grant asylum and withholding of removal to victims of domestic violence. That is what ultimately led to the Attorney General's intervention in *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018), the opinion most directly before us.

The petitioner in *Matter of A-B-* claimed persecution in the form of domestic violence based on her membership in the claimed social group "El Salvadoran women who are unable to leave their domestic relationships where they have children in common." *Id.* at 321. The BIA held that this proposed group was cognizable under *Matter of A-R-C-G-* and ordered that the petitioner receive asylum. *Id.* The Attorney General then intervened in *Matter of A-B-*, *see* 8 U.S.C. §§ 1103(a)(1), (g)(2); 8 C.F.R. § 1003.1(h)(1), and "overrule[d]" *Matter of A-R-C-G-*. *See Matter of A-B-*, 27 I. & N. Dec. at 317, 319, 340, 346. In the Attorney General's considered view, *Matter of A-R-C-G-* improperly elevated the government's concessions into binding precedent, "recogniz[ing] a new particular social group without correctly applying" the legal standards discussed above. *Id.* at 317; *see also id.* at 333.

*Matter of A-R-C-G-* was "wrongly decided," the Attorney General explained, because "[t]o be cognizable, a particular social group *must* 'exist independently' of the harm asserted in an application for asylum or statutory withholding of removal." *Id.* at 333–34 (emphasis in original) (citing, *e.g.*, *Matter of M-E-V-G-*, 26 I. & N. Dec. at 236 n.11, 243; *Matter of W-G-R-*, 26 I. & N. Dec. at 215; *Perez-Rabanales*, 881 F.3d at 67). That longstanding principle was fatal to the proposed social group in *Matter of A-R-C-G-*. As the Attorney General explained, the BIA in "*A-R-C-G-* never considered that 'married women in Guatemala who are unable to leave their relationship' was effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability 'to leave' was created by harm or threatened harm." *Id.* at 335. The proposed social group in *Matter of A-R-C-G-* thus violated the anti-circularity principle. *Id.* at 334–35.

Although the Attorney General in *Matter of A-B-* did "not decide that violence inflicted by non-governmental actors may never serve as the basis for an asylum or withholding application," he explained that such claims based on domestic violence "are unlikely to satisfy the statutory grounds for proving group persecution." *Id.* at 320.

II

In this case, petitioner claims her husband acted violently toward her because of her membership in the claimed social group "indigenous women in Guatemala who are unable to leave their relationship." The BIA held that petitioner's proposed group was not cognizable because it "suffers from the same circularity problem articulated by the Attorney General in *Matter of A-B-*." In Part IV of its opinion, the

majority correctly rejects petitioner's arguments that *Matter of A-B-* is arbitrary and capricious and undeserving of *Chevron* deference.   Maj. Op. 16–19.   But the majority nonetheless concludes in Part V that the BIA misinterpreted *Matter of A-B-*, requiring a remand to the agency.

Part V is where the problem lies.   The petitioner's proposed social group of "indigenous women in Guatemala who are unable to leave their relationship" is virtually identical to the proposed social group in *Matter of A-R-C-G-*, which was "married women in Guatemala who are unable to leave their relationship."   The Attorney General in *Matter of A-B-* clearly determined that the latter group was "not cognizable."   27 I. & N. Dec. at 334.   Yet when the BIA then applied *Matter of A-B-* to petitioner's materially indistinguishable proposed group, our court now tells the BIA it erred in not following *Matter of A-B-*.

That holding is quite mistaken, turning on a misreading of *Matter of A-B-* and a related misunderstanding of the core principles of immigration law on which *Matter of A-B-* is premised.   While today's opinion might initially appear to reject a challenge to *Matter of A-B-* and narrowly remand on case-specific grounds, in reality that is not so.   Instead, the court's opinion improperly recasts *Matter of A-B-*, with widespread consequences for the many cases that today's decision is sure to affect.   The result is also that the federal immigration law that applies in this circuit will differ considerably from the law applied elsewhere in this country.

A central problem with today's opinion—and one of the reasons I fear it will engender confusion—is that the majority offers what I see as varying and inconsistent rationales for why the BIA erred.   Each of those grounds for decision is

incorrect and each reflects a noted departure from governing law.

## A

### 1

In articulating why a remand is required, the majority first explains that "[t]he BIA seems to have erroneously understood *Matter of A-B-* to forbid any mention of feared harm within a proposed social group." Maj. Op. 19–20. The majority consequently "disagree[s]" that "in order to exist independently from the petitioner's feared harm, a proposed group may not refer to that harm at all." *Id.* at 23. This reflects legal error and departs from the decisions of our sister circuits. *See, e.g.*, *Gonzales-Veliz*, 938 F.3d at 232 (holding that a proposed group of "Honduran women unable to leave their relationship" was not cognizable because it was "defined by, and d[id] not exist independently of, the harm—*i.e.*, the inability to leave").

Simply stated, a proposed group that incorporates harm within its definition is not a group that "exist[s] *independently* of the harm asserted in an application for asylum or statutory withholding of removal." *Matter of A-B-*, 27 I. & N. Dec. at 334 (emphasis added) (quotations omitted). Recall that the overall framework requires an asylum or withholding applicant to prove three things: (1) the existence of a cognizable particular social group; (2) membership in that group; and (3) "a risk of persecution *on account of*" (or "because of") "his membership." *Reyes*, 842 F.3d at 1132 n.3 (emphasis added).

Now imagine a proposed social group that is transparently based in part on the harm, such as "Guatemalan men who are harmed by gangs." Saying that a petitioner was harmed by gangs based on his membership in the group "Guatemalan men who are harmed by gangs" would collapse the inquiries. And it would create the very circularity problem that *Matter of A-B-* sought to avoid in the domestic violence context, allowing nexus to be proven by the group definition itself. *See Matter of A-B-*, 27 I. & N. Dec. at 334 (citing, *e.g.*, *Matter of M-E-V-G-*, 26 I. & N. Dec. at 236 n.11, 243; *Matter of W-G-R-*, 26 I. & N. Dec. at 215). The majority thus errs in claiming that I "do not explain why a person seeking relief on the basis of membership in a particular social group should be required to omit any mention of threatened persecution." Maj. Op. 28. The reason, as I have explained, is the anti-circularity principle.

Contrary to the suggestion in the majority opinion, *Matter of A-B-* did not endorse the concept of a particular social group that references harm in its definition. Maj. Op. 23–25. *Matter of A-B-* in fact confirms that such a group is impermissible. *Matter of A-B-* expressly rejected the proposed social group in *Matter of A-R-C-G-*, which was "married women in Guatemala who are unable to leave their relationship." *Matter of A-B-*, 27 I. & N. Dec. at 319. This proposed group obviously does contain some immutable characteristics not defined by the harm, namely, "married women in Guatemala." But the Attorney General concluded the proposed social group still incorporated a reference to harm, because a claimed "inability to leave" was "effectively defined to consist of women in Guatemala who are victims of domestic abuse." *Id.* at 335. For that reason, the group violated the anti-circularity principle and was "not cognizable." *Id.* at 334.

If referring to harm within the group definition were allowed, *Matter of A-B-* on this central point should have come out the other way. It is thus true, as the majority explains, that *Matter of A-B-* did not "*identify* a categorical 'circularity problem.'" Maj. Op. 20 (emphasis added). But that is only because the anti-circularity rule had long existed in the law. *Matter of A-B-* thus did not "identify" and announce this rule, but it certainly applied it. Whether the anti-circularity rule applies is determined on a case-by-case basis by examining the proposed social group that an applicant brings forward. *See Matter of A-B-*, 27 I. & N. Dec. at 340; *Matter of M-E-V-G-*, 26 I. & N. Dec. at 251. But when the rule does apply, it is, indeed, a categorical one.

*Matter of A-B-*'s reliance on *Rreshpja v. Gonzales*, 420 F.3d 551 (6th Cir. 2005), only confirms this point. The Attorney General in *Matter of A-B-* specifically cited *Rreshpja* for the rule that "[t]he individuals in the group must share a narrowing characteristic other than their risk of being persecuted." 27 I. & N. Dec. at 335 (alteration in original) (quoting *Rreshpja*, 420 F.3d at 556). In *Rreshpja*, the court understood the proposed social group to be "young (or those who appear to be young), attractive Albanian women who are forced into prostitution." 420 F.3d at 555. The Sixth Circuit rejected this group because "a social group *may not be circularly defined by the fact that it suffers persecution*." *Id.* at 556 (emphasis added).

The proposed particular social group in *Rreshpja* was not completely defined by the harm, but the court rejected it because it was still *partially* defined by the harm. *Id.* The majority therefore gets *Rreshpja* backwards. Maj. Op. 23. The Attorney General in *Matter of A-B-* was not purporting to allow a group defined in part by the harm by relying on a

Sixth Circuit opinion that rejected a proposed social group that was itself partially defined by the harm, and that therefore suffered from the same problem as the proposed group in this case.

Notably, both petitioner and her amicus agree with my interpretation of *Matter of A-B-*. Petitioner herself regards the "holding" of *Matter of A-B-* to be that a particular social group "cannot be defined, *even in part*, by the fact of persecution." (Emphasis added). And amicus Center for Gender & Refugee Studies likewise agrees that under *Matter of A-B-*, the circularity rule "require[s] a group to be defined *completely* independently of the harm." (Emphasis in original). Petitioner and the amicus both regard this as a new rule, but it is not. It is the same rule that has always applied: "[t]o be cognizable, a particular social group *must* exist independently of the harm asserted." *Matter of A-B-*, 27 I. & N. Dec. at 334 (emphasis in original) (quotations omitted); *see also Matter of M-E-V-G-*, 26 I. & N. Dec. at 236 n.11.

Unlike the majority, my interpretation of *Matter of A-B-* is also aligned with that of other circuits. The majority opinion "recognize[s] that, consistent with *Matter of A-B-*, numerous courts have deemed proposed social groups that referred to feared harm to be impermissibly circular." Maj. Op. 31. The concession is well-taken. But it is, if anything, a considerable understatement, because other circuits have routinely denied petitions for review presenting materially identical proposed social groups to the one at issue here, that also referenced harm in the group definition itself.

In *Gonzales-Veliz v. Barr*, 938 F.3d 219 (5th Cir. 2019), the Fifth Circuit denied a petition for review seeking asylum

and withholding of removal based on the proposed social group "Honduran women unable to leave their relationship." *Id.* at 223.  The Fifth Circuit explained that "under *A-B-*'s analysis, [this] group cannot constitute a particular social group" because "[t]he group is defined by, and does not exist independently of, the harm—*i.e.*, the inability to leave."  *Id.* at 232.  In other words, the Fifth Circuit held, this group was not cognizable because it was "impermissibly defined in a circular manner."  *Id.*

Several months later, the Eleventh Circuit issued a similar decision in *Amezcua-Preciado v. U.S. Attorney General*, 943 F.3d 1337 (11th Cir. 2019) (per curiam).  There, the Eleventh Circuit denied a petition for review seeking relief based on the proposed social group "women in Mexico who are unable to leave their domestic relationships."  *Id.* at 1339.  The Eleventh Circuit recognized that the petitioner's "proposed social group suffers from the kinds of problems the Attorney General identified in *A-B-* as likely to render most groups of victims of private violence not cognizable."  *Id.* at 1344.  And the Eleventh Circuit made clear that "to the extent [the petitioner's] proposed group of Mexican women . . . are unable to leave their domestic relationships because they fear physical or psychological abuse by their spouse or domestic partner, this group is defined by the underlying harm asserted."  *Id.* at 1345.  In reading *Matter of A-B-* to allow proposed social groups that include feared harm in the group definition, the majority departs from both the reasoning and the results of the Fifth and Eleventh Circuit decisions.

Indeed, the majority's decision is inconsistent with many cases from other circuits that have denied petitions for review that advanced proposed social groups materially identical to the one advanced here.  *See, e.g.*, *Perez-Agustin v. U.S.*

*Attorney Gen.*, 798 F. App'x 608, 609 (11th Cir. 2020) (per curiam) (rejecting as impermissibly circular proposed social group of "indigenous women from Guatemala, who are native Mam speakers, who are victim[s] of sexual violence") (alteration in original); *Martinez Casco v. U.S. Attorney Gen.*, 800 F. App'x 835, 838 (11th Cir. 2020) (per curiam) (rejecting as impermissibly circular proposed social group of "female domestic violence victims who are unable to leave"); *Serrano-de Portillo v. Barr*, 792 F. App'x 341, 342–43 (5th Cir. 2020) (per curiam) (rejecting as impermissibly circular proposed social group of "El Salvadoran women targeted by gang members to be gang girlfriends"); *Garcia-Ventura v. Barr*, 788 F. App'x 969, 970–71 (5th Cir. 2019) (per curiam) (rejecting as impermissibly circular proposed social groups of "victims of domestic violence at the hands of their domestic partner and unable to leave their domestic partner" and "victims of domestic violence who are viewed as property by virtue of their positions within a domestic relationship"); *Gonzalez-De Moreira v. U.S. Attorney Gen.*, 787 F. App'x 659, 662 (11th Cir. 2019) (per curiam) (rejecting as impermissibly circular proposed social groups of "Salvadoran women who are victims of violence" and "Salvadoran children who are victims of violence"); *Reyes v. Sessions*, 750 F. App'x 656, 659 (10th Cir. 2018) (rejecting as impermissibly circular proposed social group of "female victims of domestic violence"). Indeed, our court in an unpublished decision rejected as impermissibly circular a proposed group of "women who have been harassed and threatened by men and whose complaints to police have failed to result in protection," because the group was "defined by the claimed persecutory conduct" and thus did "not exist

independently from the claimed persecution." *Calderon-Espejo v. Barr*, 771 F. App'x 371, 372–73 (9th Cir. 2019).**[2]**

The majority acknowledges this "plethora of unpublished decisions that rejected groups similar to the one advanced here," but claims it "cannot discern the reasoning of those decisions simply from their outcome." Maj. Op. 32 & n.9. Setting aside that the Fifth and Eleventh Circuits have rejected proposed social groups materially identical to the one here in published opinions, *see Amezcua-Preciado*, 943 F.3d at 1345; *Gonzales-Veliz*, 938 F.3d at 232, the numerous unpublished decisions reaching the same result easily reveal their straightforward reasoning: the proposed group in each case failed because it included a reference to harm, thus presenting the circularity issue.

The groups in these cases were defined in part by immutable characteristics that were separate and apart from

---

**[2]** Even before *Matter of A-B-*, courts also routinely rejected proposed social groups as circular if they referred to alleged harm or persecution. *See e.g.*, *Soto-Ambrocio v. Sessions*, 724 F. App'x 456, 458 (6th Cir. 2018) (per curiam) (rejecting as impermissibly circular proposed social group of "young women from Guatemala subject to abuse from families"); *Moreno v. Lynch*, 628 F. App'x 862, 865 (4th Cir. 2015) (rejecting as impermissibly circular proposed social group of "Hondurans who have been targeted by the police and their criminal associates to engage in drug trafficking"); *Rreshpja*, 420 F.3d at 555–56 (rejecting as impermissibly circular proposed social group of "young (or those who appear to be young), attractive Albanian women who are forced into prostitution"). The majority is thus not correct that the government and this dissent (and by implication, the other circuits) "confuse the definition of a 'particular social group' with one of its components—*i.e.*, the group's shared immutable characteristic." Maj. Op. 27. The requirement that a proposed social group exist independent of the harm is its own separate requirement. *Matter of M-E-V-G-*, 26 I. & N. Dec. at 236 n.11.

the harm, such as women from a certain country. But they were also defined in part by an "inability to leave" or some similar formulation that was regarded as a reference to harm. Unlike today's opinion, however, none of these cases treated the BIA decisions on review as having "erroneously understood *Matter of A-B-* to forbid any mention of feared harm within a proposed social group." Maj. Op. 19–20. Instead, they treated the "mention" of that harm as a dispositive violation of the longstanding anti-circularity principle.[3]

2

The majority gives two primary reasons for departing from the case law of other circuits and allowing proposed

---

[3] The majority is correct that the D.C. Circuit recently stated (in a case challenging a policy memorandum not at issue here) that the notion that "the group must be 'separate' from the harm, not consisting of the harm, even in part," is "flatly inconsistent" with *Matter of A-B-*. *Grace v. Barr*, — F.3d —, 2020 WL 4032652, at \*16 (D.C. Cir. 2020). However, the D.C. Circuit premised this point on an asserted government concession as to whether the phrase "inability to leave" could be a reference to something other than harm, *id.*, which is a different issue (the majority addresses this issue in its Part V.C and I address it in Part II.C below). In *Grace*, the D.C. Circuit held that the policy memorandum at issue there correctly stated the "circularity rule" as set forth in *Matter of A-B-*. *Id.* The court described the "circularity rule" as requiring that "social groups must 'exist independently' of the harm claimed by the applicant, that is, the applicant must be able to establish the group's existence 'without defining [it] by the fact of persecution.'" *Id.* at \*14 (quoting *Matter of A-B-*, 27 I. & N. Dec. at 334) (alteration in original). To the extent *Grace* "endorsed the view that a proposed social group is not disqualified if it includes mention of feared persecution" as the majority claims, Maj. Op. 29, the D.C. Circuit offered no explanation for this point, which is both incorrect and against the weight of authority applying *Matter of A-B-*, as detailed in this dissent.

social groups that include a reference to harm.          Both rationales fail as a matter of law.

*First*, the majority holds that a proposed social group definition can include a reference to harm because "persecution may be relevant to a group's social distinction." Maj. Op. 20; *see also id.* at 23–24.          This reflects a misunderstanding of BIA precedent and the conflation of two independent requirements for a "particular social group" to be cognizable: (1) that the group exist independent of the harm and (2) that it be socially distinct in the relevant society. These are different requirements.          Indeed, in explaining the "social distinction" element, the BIA in *Matter of M-E-V-G-* pointed out that while "the social group must exist independently of the fact of persecution," this is a separate criterion from "social distinction."          *Matter of M-E-V-G-*, 26 I. & N. Dec. at 236 n.11.

The majority dismisses this as "mechanistic[]," Maj. Op. 27, but these separate requirements perform meaningful analytical work.          It is certainly true that persecution can be used to demonstrate that a proposed group is "socially distinct."          As the BIA has explained, "[t]he act of persecution by the government may be the catalyst that causes the society to distinguish [a proposed social group] in a meaningful way and consider [it] a distinct group." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 243.          But this does not mean that the definition of the group itself can include the harm.          Why?          Because the entire reason the group "*must* exist independently of the harm asserted," *Matter of A-B-*, 27 I. & N. Dec. at 334 (emphasis in original) (quotations omitted), is to avoid the circularity problem that would otherwise allow petitioners automatically to fulfill the separate nexus requirement by injecting the harm

itself into the very definition of the group whose membership is supposedly causing the persecution.

The majority's hypotheticals only prove this point. Maj. Op. 25–26. The first one, used in *Matter of M-E-V-G-*, consists of the proposed particular social group "former employees of a country's attorney general." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 242. The second hypothetical is found in United Nations High Commissioner for Refugees (UNHCR) Guidelines and involves the proposed social group of left-handed men. UNHCR, Guidelines on International Protection, ¶ 14, U.N. Doc. HCR/GIP/02/02 (May 7, 2002) [hereinafter UNHCR Guidelines]. Critically, unlike the proposed social group in this case, neither hypothetical involves a proposed group defined in any way by the harm itself.

But though the fact of persecution does not define the group, these hypotheticals show that the harm may permissibly be used to show the group is socially distinct in the relevant society. Take "former employees of a country's attorney general" as an example. As the BIA explained, "[a]lthough such a shared past experience is immutable and the group is sufficiently discrete, the employees may not consider themselves a separate group within the society." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 242. But if "the government begins persecuting them," "[u]pon their mistreatment, it is possible that these people would experience a sense of 'group,' and society would discern that this group of individuals, who share a common immutable characteristic, is distinct in some significant way." *Id.* at 242–43.

That is consistent with the anti-circularity principle, because while "[t]he act of persecution by the government may be the catalyst that causes the society to distinguish the former employees in a meaningful way and consider them a distinct group," "the immutable characteristic of their shared past experience *exists independent of the persecution*." *Id.* at 243 (emphasis added). The UNHCR made the same point about its "[l]eft-handed men" hypothetical: the group would still be defined by "the attribute of being left-handed and *not the persecutory acts*." UNHCR Guidelines ¶ 14 (emphasis added).

The majority's two hypotheticals thus demonstrate the very analytical distinction the majority sweeps aside. Just because persecution may show that a group is socially distinct does not mean the group itself can be defined in some way by that persecution. The majority apparently suggests it would create no issue to define the hypothetical group of "former employees of the attorney general" as "former employees of the attorney general, who are being hunted down and killed." Maj. Op. 26. But that is exactly the type of group courts have routinely rejected under the anti-circularity principle. *See ante* at 53–56 & n.2. The majority is thus incorrect in suggesting that I overlook that BIA precedent "unequivocally establishes that a group's persecution may be relevant to" the social distinction requirement. Maj. Op. 27. Persecution is relevant to the requirement of social distinction, as I have explained. But that does not mean groups can include in their definitions a reference to harm, contrary to the separate

requirement that the group exist independent of the harm. *See, e.g.*, *Matter of M-E-V-G-*, 26 I. & N. Dec. at 236 n.11.[4]

*Second*, and relying on snippets of language in BIA decisions, the majority holds that a particular social group can include harm in its definition because "[t]he BIA [has] explained that a 'social group cannot be defined *exclusively* by the fact that it is targeted for persecution.'" Maj. Op. 21 (quoting *Matter of C-A-*, 23 I. & N. Dec. 951, 960 (BIA 2006) (emphasis in original)). The majority quotes other BIA decisions that use this "exclusively" language, but these decisions in turn rely on the BIA's earlier opinion in *Matter of C-A-*. *See id.* at 21–22, 31.

The majority's reliance on "exclusively" is not correct. That a proposed social group cannot be defined "exclusively" by the harm does not somehow mean it could then be based *in part* on the harm. If that were true, *Matter of A-B-*——which rejected a proposed social group that was *not* based exclusively on the harm—would have come out the other way on this critical issue. And if the only limit was that a group cannot be based "exclusively" on the harm, there would have

---

[4] The majority's hypothetical of Tutsis fleeing Rwanda is inapt. Maj. Op. 28–29. There, the proposed social group would be defined based on ethnicity, not harm. *See Donchev v. Mukasey*, 553 F.3d 1206, 1220 (9th Cir. 2009). A person who experienced genocide based on ethnicity would have no reason to define his proposed social group by including the harm in the group definition itself. Petitioner here, by contrast, had understandable strategic reasons to try that approach here, as I explain below. The majority is correct that the anti-circularity rule is not specific to the domestic violence context. But that makes the majority's departure from the rule more problematic, not less. Under the majority's approach, the many cases that have rejected proposed social groups that referenced harm were all wrongly decided on this point.

been no reason for the BIA repeatedly to articulate the principle that the group "must exist *independently* of the harm asserted." *Matter of A-B-*, 27 I. & N. Dec. at 334 (emphasis altered) (quotations omitted); *Matter of M-E-V-G-*, 26 I. & N. Dec. at 236 n.11. Indeed, cases the majority cites that use the "exclusively" formulation also state the rule that the group must exist independent of the harm. *See* Maj. Op. 22 n.5 (citing *Perez-Rabanales*, 881 F.3d at 67; *Paloka*, 762 F.3d at 196).

I suppose it is possible to imagine a proposed social group that is defined "exclusively" by harm (*e.g.*, "victims of physical assaults"). But most proposed social groups that have the circularity problem are defined in part by the harm and in part by something else, such as gender or nationality. There is nothing in the BIA's precedent suggesting it did not intend those proposed social groups to come within the anti-circularity principle, whose logic clearly extends to them. To the contrary, the BIA's formulation—"must exist independently"—ensures that groups defined in part by the harm are not allowed.

The origins of the "exclusively" phrasing also demonstrate it was not intended to operate in the way the majority uses it, *i.e.*, implicitly to allow groups defined in part by the harm. As noted, this "exclusively" language can be traced to the BIA's decision in *Matter of C-A-*. But there, the BIA stated that "the [UNHCR] *Guidelines* state that 'a social group cannot be defined *exclusively* by the fact that it is targeted for persecution,'" although "persecutory action toward a group may be a relevant factor in determining the *visibility* of a group in a particular society." *Matter of C-A-*, 23 I. & N. Dec. at 960 (emphasis in original) (quoting UNHCR Guidelines ¶¶ 2, 14).

The quoted language drives home the distinction that the majority elides, which is that persecution can be relevant for social distinction (previously known as social visibility), but not for the definition of the group itself. The quoted language also shows that the majority is misusing the "exclusively" phrasing on its own terms. The BIA in *Matter of C-A-* used this language when quoting the UNHCR Guidelines, which I discussed earlier. *Matter of C-A-*, 23 I. & N. Dec. at 960. And these Guidelines likewise make clear that a group cannot be defined in part by the harm.

In the Guidelines, the UNHCR used the left-handed men hypothetical to show that persecution can be relevant to what we now call social distinction. UNHCR Guidelines ¶ 14; *see Matter of M-E-V-G-*, 26 I. & N. Dec. at 228. But the UNHCR made clear that in that circumstance, "it would be the attribute of being left-handed and not the persecutory acts that would identify them as a particular social group." UNHCR Guidelines ¶ 14. That is a rejection of the majority's view that a group can be defined in part by the harm.

The majority opinion is thus incorrect in claiming that I "ignore the word 'exclusively'—along with similar limiting language in the BIA's decisions and those from our sister circuits." Maj. Op. 24. Instead, as the extensive discussion above confirms, it is the majority that is incorrectly using the "exclusively" formulation in service of authorizing groups that refer to harm, contrary to other circuits that have addressed substantially identical proposed social groups.

B

Equally mistaken is the majority's suggestion that the BIA erred in this case because it is possible to bracket out a

reference to harm in the definition of a proposed social group in considering whether petitioner has put forward an "otherwise cognizable" group. Maj. Op. 21–22, 27, 39–40; *see also id.* at 20 ("If a group is *otherwise cognizable*, *Matter of A-B-* does not demand that it be devoid of any reference to an applicant's claimed persecution.") (emphasis added). The majority's analysis suggests that we may consider some elements of a proffered social group as relevant to the immutable characteristic inquiry, consider other elements for their relevance to social distinction, and do so without impermissibly rewriting the petitioner's proposed social group. *See* Maj. Op. 27–28.

That is not correct. I am aware of no case, and the majority cites none, that would allow a court (or the BIA) to take a petitioner's proposed social group, break it down into constituent elements, and then assign those elements out to the distinct requirements that a petitioner must meet to demonstrate a cognizable social group. In my respectful view, that is not how this area of law works.

BIA precedent is clear that the agency must evaluate the proposed social group exactly as the petitioner has defined it. In precedent the majority cites, Maj. Op. 27, 28, 39 n.12, the BIA has held that "[w]here an applicant raises membership in a particular social group as the enumerated ground that is the basis of her claim, she has the burden to clearly indicate 'the exact delineation of any particular social group(s) to which she claims to belong.'" *Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. 189, 191 (BIA 2018) (quoting *Matter of A-T-*, 25 I. & N. Dec. 4, 10 (BIA 2009)). The Immigration Judge (IJ) must then analyze "the specific group" identified, and "[i]f an applicant is not clear as to the exact delineation of the proposed social group, the Immigration Judge should seek

clarification." *Id.* On appeal, the BIA may only consider the specific proposed social group that the petitioner presented to the IJ. *Id.* at 191–92.

These various requirements are not empty formalities. Instead, they follow from the fact that a petitioner bears the burden of proof in demonstrating "the existence of a cognizable particular social group" and persecution because of her membership in that group. *Reyes*, 842 F.3d at 1132 n.3 (quoting *Matter of W-G-R-*, 26 I. & N. Dec. at 223); *see also Cantarero-Lagos v. Barr*, 924 F.3d 145, 151 (5th Cir. 2019) ("Requiring asylum and withholding applicants to delineate their [particular social group] to an IJ is simply a logical extension of this burden of proof.").

Requiring the petitioner to delineate her proposed social groups has important practical benefits as well. It ensures that appropriate fact-finding is conducted at the IJ level. *Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. at 191; *Cantarero-Lagos*, 924 F.3d at 152. And it creates a "rational administrative process" that allows the government to respond to a petitioner's proposed social group, while preventing repeated remands to the IJ. *Cantarero-Lagos*, 924 F.3d at 152.

Consistent with this scheme, we have repeatedly determined that we lack jurisdiction to consider a new or different proposed social group that the petitioner did not present to the agency. *See, e.g.*, *Lozano Fuerte v. Barr*, 804 F. App'x 742, 742–43 (9th Cir. 2020); *Nesta-Najar v. Barr*, 804 F. App'x 604, 606 (9th Cir. 2020); *Perez Perez v. Barr*, 804 F. App'x 597, 598 (9th Cir. 2020); *Vasquez-Leon v. Barr*, 804 F. App'x 612, 613 (9th Cir. 2020); *Romero-Castro v. Barr*, 790 F. App'x 64, 65 (9th Cir. 2020); *Lopez-*

*Velasquez v. Sessions*, 742 F. App'x 195, 196 n.1 (9th Cir. 2018).

The majority agrees that "courts cannot rewrite proposed social groups." Maj. Op. 27. But the majority's suggestion that we or the BIA can splice out elements of a proposed group and consider them for some, but not other purposes, is inconsistent with established precedent and practice. The same can be said of petitioner's analogous suggestion that we should "look[] *beyond the language* used to describe [her] proposed social group." (Emphasis added). Petitioners can propose multiple and alternative particular social groups to the agency; many petitioners do so. *E.g.*, *Honcharov v. Barr*, 924 F.3d 1293, 1295 (9th Cir. 2019) (per curiam). But under the authority set forth above, we cannot take a petitioner's proposed group and alter it. Indeed, the very idea that there are severable elements in the proposed social group is misplaced. There are no such elements; there is only the proposed group.

By the same token, if we subtract one element (here "inability to leave"), we likewise create a different group than the one the petitioner articulated. Tellingly, in none of the cases cited above denying petitions with similar proposed groups to the one here did the courts proceed to consider a version of the proposed group minus the impermissibly circular reference to the harm. Nor did those courts remand to the BIA with instructions to do this. The majority opinion thus fails to recognize that the definition of the proposed group—as the petitioner has defined it—is central to how this entire scheme works.

The majority errs in suggesting it can refashion petitioner's proposed group because "[t]he BIA has taken

pains to state that 'the shared trait of persecution does not disqualify an otherwise valid social group.'" Maj. Op. 24 (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. at 243). The BIA in *Matter of M-E-V-G-* was not implying that if a group is defined to include the harm, that the BIA (or a court) could carve out the reference to harm to produce an "otherwise valid social group." Instead, the BIA said that if the petitioner *had* come forward with an "otherwise valid social group," using the fact of persecution to demonstrate the social distinction requirement would not invalidate the group. *Matter of M-E-V-G-*, 26 I. & N. Dec. at 243.

Equally mistaken is the majority's assertion that the Attorney General in *Matter of A-B-* "faulted the BIA[]" in *Matter of A-R-C-G-* for not considering the petitioner's proposed social group without its reference to harm. Maj. Op. 29. In *Matter of A-B-*, the Attorney General was certainly not instructing the BIA to ignore a reference to harm and to come up with an "otherwise cognizable" social group using some of the other characteristics the petitioner brought forth.

To the contrary, when the Attorney General in *Matter of A-B-* faulted the BIA in *Matter of A-R-C-G-* for "avoid[ing] considering whether [the petitioner] could establish the existence of a cognizable particular social group without defining the group by the fact of persecution," it was because the government in *Matter of A-R-C-G-* "conceded" that the petitioner there was a member of a cognizable social group. *Matter of A-B-*, 27 I. & N. Dec. at 334. The BIA's error in *Matter of A-R-C-G-* was in accepting that concession without any further inquiry. *Id.* And had the BIA "properly analyzed the issues," *Matter of A-B-* went on, it would have been "clear that the particular social group was *not cognizable*." *Id.*

(emphasis added). As a result, whether petitioner here included an "inability to leave" in her proposed group by mistake or not, it is part of the group as she has defined it, and such a group is not valid under the anti-circularity principle. *Id.* at 334–35.

Of course, it is highly doubtful that the petitioner's inclusion of "unable to leave" in her group definition was a mistake. Had petitioner omitted this phrase, and advanced only the remaining portions of her proposed group ("indigenous women in Guatemala"), that may have made it more difficult for her to meet other requirements for a particular social group, most notably "particularity" and "social distinction." As the First Circuit recently recognized, the inclusion of "'unable to leave' in the group definition" was likely a response to "[s]ome case law [that] gave rise to a fear that 'women,' or 'women in country X,' or even 'women in a domestic relationship,' might be too large or too indistinct a group to serve as a particular social group." *De Pena-Paniagua v. Barr*, 957 F.3d 88, 95 (1st Cir. 2020) (collecting cases); *see also Matter of A-B-*, 27. I. & N. Dec. at 336 (explaining that applicants sought "to avoid particularity issues by defining a narrow class—such as 'Guatemalan women who are unable to leave their domestic relationships where they have children in common'").

In fact, it was *Matter of A-R-C-G-*—the very case that *Matter of A-B-* overruled—that "held out 'unable to leave' as a supposedly smaller, better-suited safe harbor for women seeking asylum and withholding of removal." *De Pena-Paniagua*, 957 F.3d at 95. In other words, the petitioner here almost certainly defined her proposed social group as she did to match what the BIA in *Matter of A-R-C-G-* then regarded as cognizable. The problem is that the Attorney General has

since overruled *Matter of A-R-C-G-* and held "that the particular social group [there] was not cognizable." *Matter of A-B-*, 27 I. & N. Dec. at 334.

In short, the majority's suggestion that we can ignore the petitioner's reference to harm in her proposed social group is contrary to settled law. The same is true of the majority's determination that we can extract the reference to harm from the definition of the group and treat is as relevant only to the social distinction requirement. Today's decision breaks new ground in suggesting that any of this is permissible.

C

The majority's analysis in Parts V.A–B treated a reference to harm in the definition of a proposed social group as permissible under *Matter of A-B-*. In Part V.C, the majority concludes that the BIA erred in dismissing petitioner's appeal because the BIA "assumed her inability to leave her relationship was attributable to domestic violence," when "[t]here are many reasons a petitioner might be unable to leave a relationship, including a variety of cultural, societal, religious, economic, or other factors." Maj. Op. 33–34, 34 n.11 (quotations omitted). The majority holds that the BIA "avoided the case-specific inquiry demanded by *Matter of A-B-*" and failed to "carefully analyze[]" petitioner's claim because it "assumed that domestic violence was the only reason [petitioner] was unable to leave her relationship." *Id.* at 33–34, 36.

I will explain why this is mistaken momentarily. But it is first important to point out that this rationale is inconsistent with the rationales in Parts V.A–B. The import of Part V.C is that if "inability to leave" were based on the harm, the BIA

could have denied petitioner's appeal on this basis as impermissibly circular.  By the logic of this rationale, the problem instead is that here "inability to leave" may *not* be based on harm but on other factors, and the BIA erred by not considering that possibility.

But if a particular social group can reference harm in the group definition, then a remand for the reasons given in Part V.C is unnecessary.  Under Parts V.A–B of the majority opinion, the BIA should be instructed to treat the proposed group as written as non-circular and to analyze the group only for its compliance with the other requirements (*e.g.*, particularity and social distinction).  If the BIA can just ignore the reference to harm in the proposed group (as a mistake or otherwise) and treat it as relevant only to social distinction or some other requirement, there is no reason for the BIA to now consider whether "inability to leave" may be a reference to something other than the harm alleged. Instead, the BIA should be instructed to excise "inability to leave" and consider whether the proposed social group is "otherwise cognizable."

Or we can think of it this way: imagine the BIA had not made the supposed error that the majority identifies in Part V.C of its opinion and had even more explicitly regarded "inability to leave" as based on harm.  In that circumstance, wouldn't the BIA still have erred under Parts V.A–B of the majority opinion?  The answer apparently is "yes," because the majority says that one of the "problems with the BIA's reasoning" below is that "the BIA misunderstood *Matter of A-B-*'s holding."  Maj. Op. 33.  That reasoning would seem to necessitate a remand separate and apart from any particular arguments petitioner may have advanced to the BIA about

whether her "inability to leave" was based on something other than domestic violence. *Id.* at 33.

Regardless, the majority is wrong to hold the BIA erred by "assum[ing]" that petitioner's "inability to leave her relationship was attributable to domestic violence" and "avoid[ing] the case-specific inquiry demanded by *Matter of A-B-* and the BIA's precedents." Maj. Op. 33, 36. Petitioner herself recognizes in her opening brief that in *Matter of A-B-*, the Attorney General "*specifically rejected* the applicant's proposed social group of 'El Salvadoran women who are unable to leave their domestic relationships where they have children in common with their partners.'" (Emphasis added). Applying *Matter of A-B-*, which the court today upholds under *Chevron*, the BIA here simply considered petitioner's specific articulation of her proposed social group under the governing standards.

The BIA recognized that the petitioner's proposed social group was "substantially similar to the group in *Matter of A-R-C-G-*." The BIA at this point cited and incorporated the decision of the IJ, which made clear that the entire basis for petitioner's proposed social group was her fear of domestic violence. For this reason, the BIA could (and did) determine that as in *Matter of A-B-*, "inability to leave" here was "effectively defined to consist of women . . . who are victims of domestic abuse because the inability 'to leave' was created by harm or threatened harm." *Matter of A-B-*, 27 I. & N. Dec. at 334; *see also Larita-Martinez v. INS*, 220 F.3d 1092, 1096 (9th Cir. 2000) (explaining "the presumption" that the BIA "did review the evidence").

The BIA thus concluded that—because petitioner's group definition contained the same "inability to leave"

reference—it "suffer[ed] from the same circularity problem articulated by the Attorney General in *Matter of A-B-*." This was not a "shortcut[]," as the majority claims, Maj. Op. 33, but an application of *Matter of A-B-* of the type that has been routinely affirmed in other circuits. Nor did the BIA offer a "one-sentence analysis," as the majority claims. Maj. Op. 32. The BIA opinion devoted several paragraphs to this issue and also incorporated two pages of the IJ's decision.

The majority is thus incorrect in asserting that the BIA here "committed the very same error it made in *Matter of A-B-*." Maj. Op. 35. Again, the fatal misstep identified in *Matter of A-B-* was that the BIA in *Matter of A-R-C-G-* relied on *concessions* to hold a similar proposed group was cognizable. *Matter of A-B-*, 27 I. & N. Dec. at 334. In contrast, the BIA here did the *opposite* of what the BIA did in *Matter of A-R-C-G-*, because here it evaluated petitioner's proposed social group under the longstanding anti-circularity principle that *Matter of A-B-* reaffirmed. It is hard to understand why the BIA was required to say more when petitioner's claim clearly failed for a specific reason. As the Fifth Circuit explained in denying a petition with a materially identical proposed social group to the one here, "[a]s an adjudicatory body, the BIA necessarily relies on established precedents to decide matters pending before it and to avoid re-inventing the wheel every time." *Gonzales-Veliz*, 938 F.3d at 232. And the "BIA did not blindly apply *A-B-* as a categorical ban" when "*A-B-*'s substantive reasoning happened to squarely foreclose [the petitioner's] group." *Id.*

Of course, even allowing that the vague phrase "unable to leave" could be based on something other than harm (such as cultural factors), I am hard-pressed to understand how the BIA was supposed to derive that nuance from petitioner's

brief to the BIA. Relying on *Matter of A-R-C-G-*, petitioner's counseled brief in the BIA argued that the proposed social group "'married women in Guatemala who are unable to leave their relationship' may share an immutable trait, where specific facts demonstrated a woman's inability to leave her *abusive marriage*." (Emphasis added). Petitioner's brief to the BIA then discussed the "repugnant abuse" and "weekly beatings" at issue in *Matter of A-R-C-G-* and compared them to petitioner's own experience, explaining that petitioner "[s]imilarly" "demonstrated that she suffered deplorable harm and abuse by her 'common law' husband." Contrary to the majority opinion, the BIA thus did not "pluck[] one fact identified by [petitioner]—that her husband physically abused her." Maj. Op. 35. This abuse was the central thrust of petitioner's entire submission to the BIA.

The majority opinion nevertheless states that the petitioner "advanced evidence of economic, societal, and cultural factors that also may have prevented her from leaving her relationship." Maj. Op. 34. But what the majority cites for this are pages from the petitioner's brief to the IJ, which extensively discuss how the "inability to leave" is based on domestic violence. To the extent petitioner and her expert cited societal and cultural factors in Guatemala before the IJ, they repeatedly intermixed them with domestic violence itself. In other words, petitioner's own application thus specifically wove domestic violence into its identification of the proposed group, at a time when *Matter of A-R-C-G-* was the prevailing BIA precedent. But in all events, petitioner certainly did not present "inability to leave" as a concept distinct from the harm itself. And presenting the proposed group in that way would likely have created problems for other aspects of petitioner's required showing, such as social distinction and nexus.

Under all these circumstances, I cannot fault the BIA for not divining an interpretation of "inability to leave" that petitioner did not clearly advance. On this point, this court reviews denials of withholding of removal "for substantial evidence." *Yali Wang v. Sessions*, 861 F.3d 1003, 1007 (9th Cir. 2017) (quotations omitted). "Under the substantial evidence standard, the court upholds the BIA's determination unless the evidence in the record compels a contrary conclusion." *Arteaga v. Mukasey*, 511 F.3d 940, 944 (9th Cir. 2007). Given the (at best) imprecise nature of the phrase "inability to leave" and the record in this case, I cannot conclude that the BIA's assessment that the proposed social group was effectively defined by the harm lacks substantial evidence.[5]

Finally, the majority errs in premising its own remand on the BIA's remand in *Matter of A-B-*. According to the majority, "the best indication that [mention of physical abuse] does not categorically disqualify [petitioner's] social group is that the Attorney General remanded *Matter of A-B-* for the BIA to conduct a proper analysis, . . . [r]ather than simply invalidating th[e] group." Maj. Op. 35. This is not correct.

---

[5] The majority relies on *De Pena-Paniagua v. Barr*, 957 F.3d at 94, for the proposition that "[t]here are many reasons a petitioner might be unable to leave a relationship, including a variety of 'cultural, societal, religious, economic, or other factors.'" Maj. Op. 34 n.11. But for this observation, the First Circuit cited *Matter of A-R-C-G-*, *see De Pena-Paniagua*, 957 F.3d at 94, which the Attorney General of course overruled in *Matter of A-B-*. In all events, *De Pena-Paniagua* theorized that "a woman's inability to leave a relationship may be the product of forces other than physical abuse." *Id.* at 93. The question in this case is whether the record supports such a characterization of the proposed social group. For the reasons set forth above, the record does not compel the conclusion that the BIA erred in construing the petitioner's proposed group in the way that it did.

The Attorney General in *Matter of A-B-* was unequivocal that "[h]ad the [BIA] properly analyzed the issues" in *Matter of A-R-C-G-*, "then it would have been *clear* that the particular social group *was not cognizable*." *Matter of A-B-*, 27 I. & N. Dec. at 334 (emphasis added). The Attorney General in *Matter of A-B-* was therefore not somehow suggesting that the BIA in any further proceedings that may occur in *Matter of A-B-* itself could somehow treat as cognizable the very proposed social group that *Matter of A-B-* expressly rejected. The standard remand language in *Matter of A-B-* "for further proceedings consistent with this opinion," *id.* at 346, should thus not be construed as a basis for our court to remand a petition where the BIA complied with *Matter of A-B-*.

*    *    *

In upholding the Attorney General's decision in *Matter of A-B-*, we should have faithfully interpreted it. And in reviewing the BIA's decision applying *Matter of A-B-* to petitioner's application, we should have recognized the BIA's adherence to an Attorney General decision that is itself based on longstanding precedent and at the very least reasonable. The Attorney General in *Matter of A-B-* emphasized that under the INA, claims for asylum and withholding of removal based on domestic violence "are unlikely to satisfy the statutory grounds for proving group persecution." 27 I. & N. Dec. at 320. Today's decision does not directly quarrel with that understanding, but it sets forth an internally inconsistent analytical framework that is at odds with it, and also at odds with how other circuits have handled this issue.

Where all of this will lead is uncertain. The majority's opinion remands this case "for further consideration" so the BIA can conduct a "case-specific inquiry" under "the

required framework." Maj. Op. 37, 39, 40. The BIA can be forgiven if it finds this directive unclear. The only certainty is that these issues will be before us again, as the BIA tries to comply with both *Matter of A-B-* and today's ruling. I respectfully dissent.